**CARNEY BATES & PULLIAM, PLLC**
Allen Carney (*pro hac vice* forthcoming)
acarney@cbplaw.com
Hank Bates (*pro hac vice* forthcoming)
hbates@cbplaw.com
Samuel Randolph Jackson (*pro hac vice* forthcoming)
sjackson@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone:  501.312.8500
Facsimile:  501.312.8505

Jacob D. Barney
**ANDERSON & KARRENBERG, P.C.**
50 W. Broadway, Ste. 600
Salt Lake City, Utah 84101
Telephone: (801) 534-1700
jbarney@aklawfirm.com

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| BENJAMIN GARCIA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHAM YOUNG UNIVERSITY d/b/a BYU BROADCASTING<br><br>Defendant. | **PLAINTIFF BENJAMIN GARCIA'S CLASS ACTION COMPLAINT**<br><br>Case No. 1:24-cv-00188-AMA<br><br>Judge: |

Plaintiff Benjamin Garcia, individually and on behalf of all other similarly situated persons ("Plaintiff"), brings this action against Brigham Young University ("BYU" or "Defendant") for its violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "the Act"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. (formerly known as Facebook) ("Meta"), "personally identifiable information" which identifies the prerecorded audio visual material Plaintiff and similarly situated subscribers request or obtain from Defendant's website, https://www.byutv.org/ et. al.[1], (the "Website"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, upon investigation of counsel, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.      Plaintiff brings this consumer privacy class action to protect the privacy rights granted to him under federal law—rights BYU violates by knowingly disclosing its subscribers' personally identifiable information to Meta. Specifically, Defendant knowingly discloses its subscribers' identities alongside the prerecorded audio visual materials they request or obtain from the Website.

2.      BYU operates www.byutv.org, its streaming service through which it solely offers audio visual materials such as prerecorded television series and full-length feature films, some of which are licensed from third parties, and some of which are original productions of BYUtv.

3.      The VPPA prohibits "video tape service providers," such as Defendant, from "knowingly disclos[ing]" consumers' personally identifiable information ("PII"), defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.A. § 2710.

4.      Defendant transmits the PII to Meta via the Meta Pixel (the "Pixel"[2])— a program Defendant purposefully and knowingly deployed across its Website that provides data to Meta regarding interactions BYU's users take on the Website – including its subscribers.

---

[1] Plaintiff's claims include not only the root website https://www.byutv.org/, but also any page included within the Website (e.g., https://www.byutv.org/shows).

[2] 'Pixel' as used herein means the Pixel Defendant installed on its Website. The Facebook Pixel ID associated with the Pixel is 1387072388220141.

5.      Here, Defendant knowingly discloses to Meta information that includes a subscriber's Facebook ID ("FID") (a number assigned to each Facebook profile which, by itself, makes the profile identifiable) coupled with the title of the prerecorded audio visual material subscribers request or obtain from the Website. Because the records BYU shares with Meta contain both (i) a subscriber's FID and (ii) the title of the prerecorded audio visual material he or she requests or obtains, they constitute PII under the VPPA.

6.      Defendant's disclosure of these records to Meta occurs via the Pixel within a single transmission; each transmission includes the FID and the name of the prerecorded audio visual material subscribers request or obtain from the Website. A subscriber's FID uniquely identifies his or her Facebook profile, and the FID alone is capable of identifying the particular user by his or her Facebook profile. Therefore, Meta can easily view the particular subscriber's corresponding Facebook profile. At the most fundamental level, Defendant installed the Pixel to collect and disclose to Meta information about how its users interact with its website – including the prerecorded audio visual material its subscribers request or obtain.

7.      Defendant did not install its Pixel by accident, nor without an understanding as to its purpose or its function. To access the code necessary to install its Pixel required Defendant to visit Meta's webpage containing comprehensive information about just how the Pixel operates. Defendant installed the Pixel for the purpose of obtaining its benefits – namely, enhanced marketing outcomes which leads to more visitors and higher revenue.

8.      Throughout the relevant time period, any person could link Plaintiff's unique FID to Plaintiff's Facebook page where the following information specifically identifying him is publicly available: his name, photograph, education, and hometown.

9.      On behalf of himself and all similarly situated subscribers of Defendant, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of subscribers' PII; awarding liquidated damages in the amount of $2,500 per violation, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

10.     Plaintiff, Benjamin Garcia, is an individual who lives and is domiciled in Layton, Utah and subscribes to Defendant's Website. Throughout the class period he requested and obtained prerecorded audio visual material on the Website using his Internet-connected device and web-browsing software installed on that device ("Browser").

11.     Plaintiff registered an account the Website by providing Defendant with his first name, last name, and email address. Plaintiff's provision of this information enabled him to access audio visual material unavailable to him without an account. In exchange for watching videos, Defendant collected additional identifying information, including his IP address and information about the browser through which he accessed Defendant's audio visual materials.

12.     Defendant, Brigham Young University, is a Utah non-profit corporation, and operates its Website through which it collects the PII of its subscribers and knowingly discloses their PII to third parties, including Meta. Defendant is "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," and accordingly falls within the VPPA's definition of "video tape service provider." 18 U.S.C. § 2710(a)(4).

13.     Defendant's Website is a streaming platform that carries over 2,000 hours of prerecorded audio visual material, including scripted and non-scripted series, sports, movies, specials, and religious programming.[3]

14.     The programming available on Defendant's website is a mixture of third-party content licensed for use on the Website, and original content produced by BYU for BYUtv.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Defendant because Defendant is incorporated and has its principal place of business in Utah.

16.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[3] BYUtv, *About BYUtv*, BYU Broadcasting, https://www.byutv.org/about (last accessed November 4, 2024).

17.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      The VPPA**

15.     The VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1).

16.     The text of the VPPA is broad, providing robust protection for video-watching behavior.

17.     The VPPA was enacted in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings. The profile contained a list of 146 films that Judge Bork and his family had rented from a video store. Members of Congress denounced the disclosure as repugnant to the right of privacy.

18.     Then Senator Leahy, one of the senators who introduced the VPPA Legislation, commented on the profile during the nomination hearing: "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home." S. Rep. No. 100-599, at 5-6. "Privacy is not a conservative or liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*.

19.     The VPPA was introduced by a bipartisan group of Senators "[t]o preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1.

20.     The VPPA "reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*. at 8.

21.     While the concerns about privacy were undoubtedly true in 1988 when the VPPA was passed, the importance of privacy legislation in the modern era of data mining is more

pronounced. Indeed, during a 2012 Senate Judiciary Committee meeting entitled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

22.    The privacy rights protected by the VPPA bear a close relationship to the traditional privacy harms actionable in English and American courts, including, "for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 141 S. Ct. 2190, 2204, 210 L. Ed. 568 (2021).

23.    Here, Plaintiff alleges Defendant shared his private information with an unauthorized third party when it transmitted his video-watching behavior to Meta. This act constitutes an invasion of privacy that is highly offensive to a reasonable person.

24.    Plaintiff does not merely allege exposure to Meta, but that his information was disclosed to Meta subject to an arrangement between Defendant and Meta pursuant to which Defendant deliberately uses the Meta Pixel.[4]

25.    Plaintiff's allegations fall squarely within the scope of interests protected by the VPPA, which "seeks redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private."[5]

26.    The right of privacy in the prerecorded audio visual material one requests or obtains is inviolate.

**II.    Defendant Violates the VPPA**

     a.    <u>Defendant's Subscribers are "Consumers" Under the VPPA</u>

---

[4] *See Salazar v. National Basketball Association*, ___ F.4th ___, 2024 WL 4487971, at 7 (2d. Cir. October 15, 2024).
[5] *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d. Cir. 2016); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th. Cir. 2017) (holding violations of the VPPA cause concrete injury).

27.     Defendant invites users to become subscribers to its Website by asking them to submit their full name and a valid email address. Becoming a subscriber makes the individual identifiable to Defendant and provides a method by which Defendant can contact subscribers, such as by sending them news about shows and exclusive content.

28.     In addition to the information Plaintiff provided to Defendant to register his account and access content, Defendant collects additional data from Plaintiff when he interacts with the Website, including but not limited to, his web requests, his IP address, and information about his browser.[6]

29.     Provision of this personal information provides Plaintiff and class members with access to audiovisual content unavailable to non-subscribers. Specifically, Plaintiff's subscription provided him with access to restricted audiovisual materials such as the television show, "The Chosen" among other restricted materials.

      b.    <u>Defendant Shares its Consumers' PII with Meta</u>

         i.    *What is the Pixel?*

30.     The Pixel is a unique string of code that operates to share subscribers' online activity with Meta[7], which Meta uses to create unique, detailed profiles filled with highly personal inferences about the subscribers, such as their "interests," "behavior," and "connections."[8]

31.     A website or online business which places advertising on Meta's platform, such as Defendant, is encouraged to install a Pixel because, through the Pixel, Meta can more accurately target the website's advertising to specific users.[9]

---

[6] *See Privacy Policy*, BYUtv, www.buytv.com/privacy (last accessed October 31, 2024)

[7] Meta for Developers, *Meta Pixel*, Meta https://developers.facebook.com/docs/meta-pixel/ (last visited November 4, 2024); Meta for Developers, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, Meta https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.") (last visited November 4, 2024).

[8] Meta, *Audience Ad Targeting: How to find people most likely to respond to your ad*, Meta for Developers (2024), https://www.facebook.com/business/ads/ad-targeting (last visited January 30, 2024).

[9] Meta, *Retargeting*, Meta https://www.facebook.com/business/goals/retargeting (last visited October 29, 2024).

32.     Pivotal to the Pixel's effectiveness is its ability to associate a user's interactions on websites across the internet with that specific user's Facebook profile. In fact, this is the fundamental purpose the Pixel serves: it continuously adds data from new interactions to the historical profiles Meta maintains on individuals with Facebook profiles. Each interaction sent to Meta via the Pixel (including by Defendant), is linked to all of the personal information Meta possesses about the user.

33.     Moreover, the Pixel can recognize Defendant's subscribers even when they visit different websites across the Internet - and even after a subscriber clears his or her browser history.

34.     The Pixel allows Meta to learn (i) any websites users visit (in general), (ii) how often users visit websites and the interactions they take on them, and (iii) which kinds of advertisements each specific user positively responds to (i.e., such as by clicking on it and/or following it through to purchase the advertised product).

35.     After users' activity is transmitted to Meta via the Pixel, Meta compiles the information to pinpoint personalized "audiences" that consist of individuals who are likely to respond to particular advertisers' messaging, improving the ability of businesses to serve specific (i.e., "targeted") subscribers with personalized advertisements. This improves the accuracy and effectiveness of a business's advertising campaigns.

36.     In addition to the information every user is required to provide to Meta when creating an account (including First and Last name, date of birth, gender, email address and/or mobile number, and password), Meta also possesses and has access to all of the information a user posts on his Facebook profile.



*Figure 1*

37.     Information about a website's users becomes the currency by which Meta and said website exchange value;[10] websites provide information to Meta, and in exchange, Meta provides unmatched advertising capabilities to Defendant. Meta promotes its pixel as a tool to "[f]ind new customers… Drive more sales… [and] reach people who are more likely to take an action you care

---

[10] See Ben-Shahar, Omri, *Privacy is the New Money, Thanks to Big Data*, Forbes, https://www.forbes.com/sites/omribenshahar/2016/04/01/privacy-is-the-new-money-thanks-to-big-data/?sh=2229e4853fa2 (last visited Feb. 6, 2024) ("We don't pay old money to use Facebook, Google search, CNET, or Forbes.com. Instead, each of these websites competes for our New Money currency—collecting mountains of information about us when we use their services and commercializing their databases.").

about, like making a purchase."[11] In fact, it is this very business model that has Meta on pace to earn almost *$150 billion* in advertising revenue in 2024.[12]

38.     Thus, Defendant transmitted each of Plaintiff's interactions on the Website to Meta via its Pixel. Meta was then able to instantaneously associate each interaction with Plaintiff's personal information that he submitted when creating his account, and any personal information available on his Facebook profile.

39.     Approximately seven-in-ten U.S. citizens have a Facebook profile[13] – all of whom provided the same personal information to Meta when creating their Facebook profiles. Meta promotes its ability to allow businesses to target their ads to specific audiences using these types of identifying information[14] as well as information about actions specific users have taken on the businesses' websites.[15]

40.     In sum: the Pixel is a tool a website can install to gather data about its users and share that data with Meta in return for more effective placement of its online ads.

ii.     *Defendant's Pixel Operated as Intended*

41.     As stated above, the Pixel collects information about the users that visit a website on which it is installed and transmits the information to Meta. The method and manner in which Defendant configured its Pixel to transmit this information to Meta constitutes a disclosure of the

---

[11] Meta Business Help Center, *About Meta Pixel*, Meta (2024) https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited October 16, 2024).

[12] Meta Investor Relations, *Meta Reports Second Quarter 2024 Results*, Meta (July 31, 2024) https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Second-Quarter-2024-Results/default.aspx (last visited October 29, 2024).

[13] Schaeffer, Katherine, *5 Facts about how Americans use Facebook, two decades after its launch*, Pew Research Center, (February 2, 2024) https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed October 15, 2024).

[14] Meta Business Help Center, *Age and gender*, Meta, https://www.facebook.com/business/help/151999381652364 (last accessed October 15, 2024); See also Meta Business Help Center, About specific targeting, Meta, https://www.facebook.com/business/help/121933141221852?id=176276233019487 (last accessed October 15, 2024).

[15] Meta Business Help Center, *Options to create a website custom audience*, Meta, https://www.facebook.com/business/help/2539962959620307 (last visited October 15, 2024).

personally identifiable information of its subscribers because each video requested or obtained by each unique subscriber is identified and disclosed to Meta.

42.    The transmissions Meta receives contain two categories of information: interactions, or "events," which describe the specific actions a user takes on a website (i.e., clicking buttons or searching for content), and a unique identifier, which Meta uses to link the transactions with the correct user-profile – here, the FID.

43.    These two pieces of information are transmitted to Meta, via the Pixel, for every interaction it tracks – so, the identifier is connected to and/or linked with the interaction.

44.    A FID is a unique and persistent identifier that Meta assigns to each of its users. With nothing but a user's FID in hand, Meta can view that user's unique Facebook profile.  In fact, any person in possession of nothing more than a user's FID can locate the user's unique Facebook profile with the execution of one simple command within an internet browser (i.e., entering www.facebook.com/[FID] within the browser). A FID is nothing short of a link to the user's Facebook profile.

45.    When a subscriber requests or obtains prerecorded audio visual material on Defendant's Website, the Pixel installed and customized by Defendant discloses the subscriber's PII to Meta. This PII includes information identifying the prerecorded audio visual materials the subscriber requests or obtains. Specifically, Defendant knowingly discloses to Meta in a single transmission the URL with the name of the prerecorded audio visual material requested or obtained in conjunction with the subscriber's FID.

46.    Upon receipt of that transmission containing the URL, the name of the video content a subscriber requested or obtained, and the FID – all of which Defendant knowingly discloses to Meta—Meta learns the identity of the subscriber and the specific prerecorded audio visual material he requests or obtains from the Website.

47.    Relevant here, through the Pixel it installed on its Website, Defendant knowingly disclosed to Meta both the title of the prerecorded audio visual material a subscriber requested or obtained and the subscriber's FID in one single network transmission. Meta needs no additional

information to connect a subscriber to the prerecorded audio visual material they requested or obtained on Defendant's Website. This transmission is depicted in the below example:



*Figure 2-a[16]*

48.    In this example, Defendant knowingly disclosed to Meta that Allen Carney[17] requested or obtained Defendant's prerecorded audio visual material of the show *Parents in Progress* entitled "The Loneliness Epidemic."

49.    The FID is displayed as a numeric value referred to as the "c_user." The FID associated with Allen Carney's Facebook profile is "61567865736804."

---

[16] Figures numbered as "a," "b," and "c" indicate they are closer views of the same screenshot.

[17] For the purposes of demonstrating how the Pixel transmits video titles alongside the user's FID in the c_user cookie, the screenshots in Figures 2-4, 6 show the network traffic from watching videos on byutv.org from the same browser used to log into the Facebook account for Allen Carney.

50.    The disclosure of the FID is coupled with the title of the prerecorded audio visual material the subscriber requested or obtained within the URL transmitted to Meta:



*Figure 2-b*



*Figure 2-c*

51.    Through this transmission, Meta uniquely identifies the subscriber requesting or obtaining the prerecorded audio visual material "The Loneliness Epidemic." This individual is identifiable to any ordinary person in possession of this information because submitting "Facebook.com/61567865736804" into a browser's search bar (and nothing more), as illustrated by Figure 3, will direct the browser to populate Allen Carney's Facebook profile page, as can be seen in Figure 4.



*Figure 3*



*Figure 4*

52.    Just as depicted above for Allen Carney, this process occurs in exactly the same way for any Facebook user visiting Defendant's website. Every time those users watch a video, Defendant transmits the title of the video material they requested or obtained in conjunction with their FID.

53.    The PII shared by Defendant is personal and unique to Plaintiff and each Class member. Defendant's choices also affect Plaintiff and Class Members' control of information concerning their person. "Most Americans hold strong views about the importance of privacy in their everyday lives,"[18] and 93% of adults believe it is important to have control over who can access information about them.[19]

54.    The VPPA establishes a right to privacy in U.S. citizens' PII regardless of the medium through which prerecorded audio visual material is requested or obtained. It imposes responsibilities on video tape service providers, like Defendant, to limit disclosure of PII.

55.    By knowingly disclosing its subscribers' PII to Meta, Defendant violates their privacy rights protected by the Video Privacy Protection Act.

---

[18] Mary Madden & Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Res. Ctr. (May 20, 2015) *see also* EPIC, *Public Opinion on Privacy* (2018).
[19] *Id.*

56.     As demonstrated in the above Figures 2-4, Defendant's Pixel operated exactly as it was designed – providing Meta with a link to Plaintiff's and the class members' Facebook profiles identifying the audio visual materials requested or obtained from the Website.

c.    **Defendant's Disclosure of PII to Meta was Knowing**

57.     Defendant operates its Website in the U.S., accessible from a computer browser at https://www.byutv.org/.    Defendant, and Defendant alone, is responsible for the creation, configuration, and maintenance of its website.

58.     Defendant purposefully installed and programmed the Pixel into its Website operation, thus making the knowing choice to share subscribers' PII with Meta.

59.     At all relevant times, Defendant knew the Pixel discloses PII to Meta. This is evidenced by several things, including but not limited to: (i) the Pixel has one, singular purpose: to collect interactions related to specific users; (ii) this purpose is well documented and even better publicized; and (iii) the manner in which Defendant configured its Pixel demonstrates it possesses a sophisticated understanding of this technology.

60.     Defendant's knowledge of the Pixel is further evidenced by the fact that Defendant benefitted from the Pixel's purpose. Installation of the Pixel enabled Defendant to target digital advertising to its subscribers (and to potential subscribers) based on the material those subscribers previously requested or obtained from the Website, including prerecorded audio visual materials.[20]

61.     Defendant specifically benefitted from its installation of the Pixel because Defendant advertises on Facebook, meaning its disclosure of users' interactions to Meta ensured its ads were shown to the right individuals on Facebook at exactly the right time.

i.    *Meta Thoroughly Explains the Pixel's Purpose and its Function*

---

[20] Meta for Developers, *Conversion Tracking*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited November 4, 2024).

62.     Defendant obtained the base code[21] necessary to install the Pixel from Meta's online business portal, which provides substantial literature about the pixel's purpose and how it functions.

63.     Meta explains to prospective Pixel users that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website…. Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website…. The pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. *You'll also have options to reach those customers again through future Meta ads*."[22] (emphasis added)

64.     In its "Get Started" page, Meta explains "[b]y default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."[23] In addition, website operators can also program their Pixel to track "conversions" (website visitor actions)[24] which are sent to the Facebook Ads Manager and the Facebook Events Manager to be used to analyze the effectiveness of ad campaigns and to define custom audiences to adjust and create new campaigns.[25]

65.     Meta's "Get Started" page further explains how it can identify website visitors and match them to their Facebook pages: "[The Meta Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."

---

[21] Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 15, 2024).

[22] Meta Business Help Center, *About Meta Pixel*, Meta https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited November 4, 2024).

[23] Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 15, 2024).

[24] *Id*.

[25] Meta for Developers, *Conversion Tracking*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited November 4, 2024).

66.    The purpose of the Meta Pixel – tracking and sending website visitor activity to Meta to match with the visitor's Facebook account – is thoroughly explained.

ii.    *Defendant's Pixel Demonstrate it Understands How the Pixel Works*

67.    A Pixel does not appear within a website merely by happenstance, to do so required Defendant to follow detailed instructions as depicted below:



How to use the event setup tool

1.  Go to **Meta Events Manager**.

2.  Click the **Data sources** ⚘ icon in the left menu of the page.

3.  Select the name and ID of your data.

4.  Click the **Settings** tab at the top of the page.

5.  Select **Open event setup tool** under **Event setup**.

6.  Enter your URL and click **Open website**. The event setup tool will launch in your website browser.

7.  Click **Review** by each suggested event then select **Confirm** or **Dismiss**.

8.
To add events that don't show up in your suggested list, navigate your website as usual to find the buttons or webpages you want. Select **Track new button** or **Track a URL** and follow the onscreen instructions.

**Note**: When you set up an event on a button, you're adding the event to all buttons with the same or similar text on your website.

9.  Select an event.

10. Set up parameters for your event.

*Figure 5*[26]

68.    There is no reason a business must install the Pixel on its website – a Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables a business, like Defendant, to benefit from the collection of measurable data that

---

[26] Meta Business Help Center, *Use the Facebook Event Setup Tool for Web*, Meta https://www.facebook.com/business/help/777099232674791?id=1205376682832142 (last visited November 4, 2024); "Events websites can choose to track include: 'Subscribe', 'Add Payment Info', 'Search' and 'View Content' among others." See Meta, Specifications for Meta Pixel standard events, Meta Business Help Center (2024) https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited November 4, 2024).

details how users interact with their websites, such as whether users initiate purchases on the website, what items they view, and, relevant here, the prerecorded audio visual material users request or obtain on a particular webpage.

69.    The Pixel, as programmed on Defendant's Website, betrays the possibility that Defendant is ignorant to this technology. Indeed, that Defendant's use of the technology was knowing is further evidenced by the fact that Defendant's Pixel shares information beyond the default categories automatically tracked by a Pixel upon installation. Defendant's Pixel is programmed to collect "Button Click" data. "Button Click" data tracks which buttons or links subscribers click and when they do so. On Defendant's Website, "Button Click" data is disclosed to Meta when a subscriber clicks the button to play or pause the prerecorded audio visual material the subscriber has requested or obtained, including the exact second the subscriber clicked pause or play.



*Figure 6-a*



*Figure 6-b*

70.    The presence of settings on Defendant's Pixel beyond the default settings demonstrates that Defendant possesses a sophisticated understanding of this technology, its purpose, and how it works.

## PLAINTIFF-SPECIFIC ALLEGATIONS

71.    Plaintiff Benjamin Garcia has been a subscriber of Defendant's since approximately 2015. Plaintiff Garcia has also been a Facebook user with a unique Facebook profile page during the entire class period.

72.    When he created his Facebook profile, Meta required Plaintiff Garcia to provide: his name, date of birth, gender, contact information, and password.

73.    During the relevant period, Plaintiff Garcia's Facebook profile included publicly available information specifically and uniquely identifying him, including but not limited to his full name, his photograph, his hometown, and education. Any person could use Plaintiff Garcia's unique FID to link directly to his Facebook page and view this publicly available, uniquely identifying information.

74.    Because he possessed a subscription, Plaintiff Garcia was granted access to exclusive prerecorded audio visual materials from the Website.

75.    When Plaintiff Garcia requested or obtained prerecorded audio visual material, BYU collected other categories of information from him as well, including his web requests, his IP address, and information about his browser.

76.    Plaintiff Garcia created his account on byutv.org to request or obtain prerecorded audio visual content, and by registering his account he gained access to audio visual content exclusively available to subscribers."

77.    In the two years preceding this action, Plaintiff Garcia requested or obtained prerecorded audio visual material on the Website from his computer Browser. Specifically, Plaintiff requested or obtained prerecorded, previously aired episodes of "Music & the Spoken Word" as well as many others.[27]

---

[27] BYUtv, *Music & the Spoken Word*, BYUtv https://www.byutv.org/music-and-the-spoken-word (last visited October 30, 2024).

78.     Just as depicted in the Allen Carney exemplars in *Figures* 2-4, and 6 above, Defendant disclosed to Meta the titles of the prerecorded audio visual materials Plaintiff Garcia requested or obtained along with the c_user cookie containing his FID, which is directly linked to Plaintiff Garcia's personal Facebook profile, in the same network transmission.

79.     Each time Defendant disclosed Plaintiff Garcia's personally identifiable information to Meta, the disclosure was knowing and deliberately done to increase Defendant's opportunities to display effective advertising to Plaintiff Garcia and users like Plaintiff Garcia in the future.

80.     Each time Defendant knowingly disclosed Plaintiff's PII to Meta, it violated his rights under the VPPA.

## CLASS ALLEGATIONS

81.     Plaintiff brings this lawsuit under the Rules 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who requested or obtained prerecorded audio visual material through their subscription to Defendant's Website and had a Facebook profile during the period the Pixel was active on Defendant's Website.

82.     The "Class Period" is from November 5, 2022, to the present.

83.     Excluded from the Class is Defendant, any controlled person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

84.     **Numerosity**: The Class consists of at least hundreds of individuals, making joinder impractical.

85.     **Commonality and Predominance**: Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members. Questions common to the Class include:

A.    Whether Defendant knowingly disclosed Plaintiff's and Class members' PII to Meta;

B.    Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and

C.    Whether Defendant should be enjoined from disclosing Plaintiff's and Class members' PII.

86.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the proposed Class because, among other things, Plaintiff and members of the class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events of wrongful conduct by Defendant.

87.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.

88.    **Predominance and Superiority**: Plaintiff satisfies the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual plaintiffs is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

89.    **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class,

making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

90.     **Particular Issues.** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act**
**18  U.S.C. § 2710**

91.     Plaintiff incorporates and realleges the above factual allegations by reference.

92.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

93.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering prerecorded audio visual materials and those sales affect interstate or foreign commerce. Specifically, Defendant operates a website which hosts videos accessible by website visitors, and the audio visual material is related to Defendant's business (as opposed to an unrelated third party) and makes up part of Defendant's business.

94.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are subscribers to Defendant's service who requested or obtained prerecorded audio visual material. Specifically, Plaintiff and Class members provided Defendant with personal information in exchange for receipt of information and/or content from Defendant, some or all of which became available by virtue of their provision of personal information to Defendant. The

provision of information allowed Defendant to identify them and contact them. Thus, Plaintiff and Class members are "consumers" under this definition.

95.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

96.    Defendant knowingly disclosed Plaintiff's and Class members' PII—specifically, their FIDs in conjunction with the title and URL of the prerecorded audio visual material they requested or obtained—to Meta.

97.    This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Meta as having requested or obtained Defendant's prerecorded audio visual material, including the specific prerecorded audio visual materials requested or obtained on Defendant's Website. Indeed, Meta (or an ordinary person possessing a class member's FID) can identify the individual associated with a FID simply by entering "Facebook.com/[FID]" into a web browser.

98.    Defendant never obtained from Plaintiff, or any Class member, informed, written consent. More specifically, Defendant never obtained from Plaintiff or any Class member, informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member, informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

99.    Defendant's disclosures were made knowingly, as it programmed the Pixel into its Website code, knowing that doing so would disclose to Meta the titles of the prerecorded audio visual materials and the FIDs pertaining to any subscriber who requested or obtained a prerecorded audio visual material.

100.    By disclosing Plaintiff's and the Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to request or obtain prerecorded audio visual materials in private. 18 U.S.C. § 2710(c).

101.    Plaintiff and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendant's enrichment by means identifying information pertaining to Plaintiff and Class members without authorization or consent.

102.    As a result of these violations, Defendant is liable to Plaintiff and Class members.

103.    On behalf of herself and all members of the Class, Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.      Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

ii.     Find that Defendant's actions, as described herein, constitute violations of the VPPA;

ii.     Enter judgment in favor of Plaintiff and the Class;

iii.    Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

iv.     Award Plaintiff and Class members the actual and/or statutory damages to which they are entitled under the VPPA;

v.      Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

vi.     Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

vii.    Award such other legal and equitable relief as the Court deems necessary and

appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: November 11, 2024

Respectfully submitted,

_____

Allen Carney
acarney@cbplaw.com
Joseph Henry Bates
hbates@cbplaw.com
Samuel Randolph Jackson
sjackson@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone:  501.312.8500
Facsimile:  501.312.8505


ANDERSON & KARRENBERG, P.C

*/s/ Jacob D. Barney*_____
Jacob D. Barney