James Jardine (UT Bar No. 1647)
jjardine@rqn.com
Michael Erickson (UT Bar No. 12503)
merickson@rqn.com
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 323-3351

Michael Bleicher (*pro hac vice* forthcoming)
michael.bleicher@zwillgen.com
Jeff Landis (*pro hac vice* forthcoming)
jeff@zwillgen.com
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 706-5251

*Attorneys for Defendant*
*Brigham Young University*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH – CENTRAL DIVISION**

| | |
|---|---|
| BENJAMIN GARCIA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHAM YOUNG UNIVERSITY,<br><br>Defendant. | **DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Case No. 1:24-cv-00188-AMA<br><br>Judge: Hon. Ann Marie McIff Allen<br>Magistrate Judge: Hon. Daphne A. Oberg |

## TABLE OF CONTENTS

RELIEF SOUGHT ....................................................................................................1

INTRODUCTION AND SPECIFIC GROUNDS FOR RELIEF ....................................................1

BACKGROUND ....................................................................................................4

A. BYU ....................................................................................................4

B. Use of the Meta Pixel on BYUtv ....................................................................................................5

C. Plaintiff's Alleged Experiences and Disclosures to Facebook ....................................................6

LEGAL STANDARD ....................................................................................................7

ARGUMENT ....................................................................................................8

I. BYU is not a "Video Tape Service Provider" Under the Meaning of the VPPA. ....................................................8

A. Providing Videos Must be a Primary Business Focus of a VTSP. ....................................................8

B. BYUtv Entertainment is Peripheral to BYU's Educational Business. ....................................................11

II. Plaintiff Does Not Allege BYU Knowingly Disclosed PII to Facebook. ....................................................13

III. By Signing Up for Facebook and Expressly Agreeing to Its Policies, Plaintiff Consented to Disclosure. ....................................................19

CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abady v. Lipocine Inc.*,
No. 2:19-CV-00906, 2023 WL 2933080 (D. Utah Apr. 13, 2023)....................................4, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................7

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ..............................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................7, 11

*Berneike v. CitiMortgage, Inc.*,
708 F.3d 1141 (10th Cir. 2013) .........................................................................................4

*Cantu v. Tapestry, Inc.*,
No. 22-CV-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023).......................10, 11

*Carroll v. Gen. Mills Inc.*,
No. CV 23-1746 DSF, 2023 WL 4361093 (C.D. Cal. June 26, 2023) ........................2, 8, 9, 11

*Christopherson v. Cinema Ent. Corp.*,
No. 23-CV-3614, 2024 WL 4492021 (D. Minn. Sept. 17, 2024).......................................10, 11

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023) ............................................................................15

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ......................................................................................13, 15

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) ..............................................................................19

*Guenther v. Lockheed Martin Corp.*,
972 F.3d 1043 (9th Cir. 2020) ..........................................................................................18

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)..............................................................................................14

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ........................................................................17, 18

*In re Hulu Priv. Litig.*,
No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ....................................... 14

*In re Myriad Genetics, Inc.*,
No. 2:19-cv-0707, 2021 WL 977770 (D. Utah Mar. 16, 2021) ............................................ 7, 8

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)............................................................................... 1, 12, 16

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ........................................................................ 8, 9

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020)........................................................................................... 18

*Javier v. Assurance IQ, LLC*,
No. 4:20-cv-02860, 2021 WL 940319 (N.D. Cal. Mar. 9, 2021) ........................................... 19

*M. K. v. Google LLC*,
No. 21-CV-08465-VKD, 2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) ................................ 17

*Sterk v. Redbox Automated Retail, LLC*,
672 F.3d 535 (7th Cir. 2012) ................................................................................ 1

*Tawam v. Feld Entertainment Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) ..................................................................... 9-10, 11

*United States v. Morris*,
928 F.2d 504 (2d Cir. 1991)................................................................................ 16-17

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989)........................................................................................ 11-12

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
842 F.3d 430 (6th Cir. 2016) ............................................................................... 17

*Yoder v. Ingersoll-Rand Co.*,
31 F. Supp. 2d 565 (N.D. Ohio 1997)....................................................................... 16

**Statutes**

10 U.S.C. § 949p-5 ........................................................................................ 16

15 U.S.C. § 6821............................................................................................. 16

18 U.S.C. § 2710............................................................................................. 1

18 U.S.C. § 2710(a)(4) .......... 2, 8, 10, 11

18 U.S.C. § 2710(b)(1) .......... 16

18 U.S.C. § 2710(b)(2)(B)(i) .......... 3, 18, 22

18 U.S.C. § 2710(b)(2)(B)(ii) .......... 22

18 U.S.C. § 2710(b)(2)(B)(iii) .......... 22

18 U.S.C. § 2710(c)(2)(A) .......... 7

**Other Authorities**

Fed. R. Civ. P. 8 .......... 7

Fed. R. Civ. P. 12(b)(6) .......... 1, 7

## RELIEF SOUGHT

Defendant Brigham Young University d/b/a BYU Broadcasting ("BYU"), through its counsel, moves to dismiss Plaintiff Benjamin Garcia's ("Plaintiff") Class Action Complaint ("Complaint") under Fed. R. Civ. P. 12(b)(6). BYU respectfully requests that this Court dismiss the Complaint without leave to amend.

## INTRODUCTION AND SPECIFIC GROUNDS FOR RELIEF

This action is one of hundreds of putative class action lawsuits filed in the last several years that seeks to frame a website's use of a website analytics and marketing tool known as the Meta Pixel as a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). The VPPA—passed in 1988 after a brick-and-mortar video store gave a reporter a list of 146 movies Supreme Court nominee Robert Bork rented—is a narrow statute with a specific purpose. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278, 288 (3d Cir. 2016) (noting the VPPA "serves different purposes and protects different constituencies, than other, broader privacy laws"). The VPPA has also been described as a "not well drafted" statute. *See id*. at 278 (quoting *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 538 (7th Cir. 2012)). Despite its limited purpose, plaintiffs' firms throughout the country now seek to convert the VPPA into a catch-all privacy law that goes well beyond the statute's intended purpose to cover the sharing of *any* information related to video viewing on *any* website. The motivation is clear: plaintiffs' counsel seek to use the ubiquity of video on the internet and the VPPA's high statutory damages to leverage hefty settlements from sites that offer *any* type of video, even in the absence of any actual harm to users.

The motives here are no different, even though the target is. The Complaint alleges that Plaintiff watched videos on BYUtv, a website owned and operated by Brigham Young University

("BYU"), a private, religious higher education institution founded, guided, and supported by The Church of Jesus Christ of Latter-day Saints (the "Church"). BYU's religious and educational mission is to assist students "in their quest for perfection and eternal life."[1] BYU accomplishes this mission by providing a campus "environment enlightened by living prophets and sustained by those moral virtues which characterize the life and teachings of the Son of God."[2]

Plaintiff claims that when he watched BYUtv videos (which not surprisingly, given the mission of BYU and the Church, are all family-friendly and based on religious values), the URLs of pages containing those videos were shared with Facebook, which also received Plaintiff's Facebook ID ("FID") via a cookie Facebook placed on Plaintiff's browser. Based on this innocuous conduct that Plaintiff does not allege harmed him, Plaintiff seeks potentially hundreds of millions of dollars in statutory damages from BYU (and the Church). Plaintiff's claims, however, do not and cannot give rise to VPPA liability for three separate reasons.

First, BYU is not a "video tape service provider" ("VTSP") under the VPPA. The VPPA's restrictions apply only to VTSPs, defined as someone "*engaged in the business*, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). Numerous courts have held that to be "engaged in" such business, providing video has to be a defendant's "particular field of endeavor," such that "[d]efendant's business is centered, tailored, or focused around providing and delivering audiovisual content." *Carroll v. Gen. Mills Inc.*, No. CV 23-1746 DSF (MRWX), 2023 WL 4361093, at *4 (C.D. Cal. June 26, 2023). The Complaint,

[1] BYU, "Mission Statement," https://aims.byu.edu/byu-mission-statement.
[2] *Id*.

however, merely recites the statutory definition of a VTSP without alleging facts showing that BYU's business is focused on providing audio visual content (which it is not) as opposed to providing religious-based educational services (which it is). As such, the Complaint fails to adequately allege that the VPPA applies to BYU at all.

Second, the Complaint fails to state a claim because it does not allege that BYU disclosed Plaintiff's identity or other Personally Identifiable Information ("PII") to Facebook. Nowhere does the Complaint allege that *BYU* knew Plaintiff's FID such that BYU could disclose that information to Facebook (because BYU did not know). Rather, the Complaint shows only that FIDs are created by Facebook and read by Facebook, via a cookie Facebook places on users' browsers. Even if that were considered a disclosure by BYU (it should not be), the Complaint fails to allege that BYU made the disclosure "knowingly" because the VPPA's text requires that the provider have knowledge both that (1) PII is being disclosed and (2) the PII concerns a subscriber. Here, the Complaint does not allege that BYU knew, or could know, whether it disclosed information about a BYUtv subscriber, as opposed to a non-subscriber with no ongoing relationship with BYUtv.

Third, the Complaint fails because Plaintiff provided his consent to Facebook for exactly the type of information sharing that he alleges took place here. The VPPA contains an exception permitting disclosure of PII when "informed, written consent" is provided in "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). Here, Plaintiff acknowledges he signed up for Facebook; this means he agreed to Facebook's Terms of Use and Privacy Policy. Those documents (which are distinct and separate from any BYU form setting forth Plaintiff's obligations to BYU), provided that

Facebook would use cookies to collect exactly the information at issue here, including from third-party websites like BYUtv. When Plaintiff agreed to those Terms of Use and Privacy Policy, he thus consented to the very disclosure he complains about (which he also would have consented to via BYUtv's privacy policy).

## BACKGROUND

### A. BYU

BYU is a private religious university and a Utah non-profit corporation. ECF No. 2 ("Complaint" or "Compl.") ¶ 12. BYU is sponsored by the Church and has over "35,000 students who come from 105 countries and every state in the United States" and in addition to undergraduate education offers "96 master's and 30 doctoral programs."[3] BYU is sponsored by the Church. The Church itself has over 17 million members around the world, including nearly 7 million in the United States.[4]

BYU operates the website www.byutv.org. Compl. ¶ 2, 12. The BYUtv website describes BYUtv as "[a] service of Brigham Young University" through which the university "creates purposeful, engaging viewing experiences that entertain, inspire, uplift, and improve families and

---

[3] BYU, "Facts and Figures," https://www.byu.edu/facts-figures. The Court may properly consider "documents incorporated by reference in the complaint" and "documents referred to in and central to the complaint, when no party disputes [their] authenticity." *Abady v. Lipocine Inc.*, No. 2:19-CV-00906, 2023 WL 2933080, at *1 (D. Utah Apr. 13, 2023) (cleaned up) (quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013)). Here, the Court may take judicial notice of pages on BYU's website, including webpages for BYUtv and the home page for BYU itself, as they are either cited in the Complaint directly (*see, e.g.*, Compl. ¶ 2) or central to the complaint's allegations about BYU's offering of BYUtv.

[4] *See* The Church of Jesus Christ of Latter-Day Saints, "Facts and Statistics," https://newsroom.churchofjesuschrist.org/facts-and-statistics; https://newsroom.churchofjesuschrist.org/facts-and-statistics/country/united-states.

communities.[5] Consistent with BYU's and the Church's mission "to assist individuals in their quest for perfection and eternal life," BYUtv offers free religious programming, such as *The Chosen*, as well as free family-friendly programming consistent with the values BYU seeks to promote. *See, e.g.*, Compl. ¶ 29.[6]

BYUtv is available for free both online at http://www.byutv.org and via satellite and cable providers.[7] *See* Compl. ¶ 12. Plaintiff does not allege that there is any content exclusive to the BYUtv website that cannot be accessed via satellite or cable or that there is any cost to access any BYUtv content (because there is not; it is entirely free). Users may (but are not required to) create an account with BYUtv; additional content is available to individuals who register for a free account. *See, e.g.*, *id.* ¶ 29. Plaintiff alleges that he created such a free account. *See id.*

**B. Use of the Meta Pixel on BYUtv**

Plaintiff alleges that during the time he accessed byutv.org, the website incorporated a Meta Pixel—a "program … that provides data to Meta regarding interactions BYU's users take on the Website." *Id.* ¶ 4. According to Plaintiff, when a Facebook account holder watches videos on BYUtv, the Pixel discloses (1) "the URL with the name of the prerecorded audio visual material requested or obtained" along with (2) the account holder's Facebook ID ("FID"), which is "a number assigned to each Facebook profile which, by itself, makes the profile identifiable"

[5] BYU, "About BYUtv," https://www.byutv.org/about.
[6] *See also* BYUtv, "Studio C," https://www.byutv.org/studioc ("Feel-good laughs without being crass. A sketch comedy show for the entire family.").
[7] *See also* BYUtv, "BYUtv Channel Lookup," https://www.byutv.org/channel.

as belonging to a single individual. *Id.* ¶¶ 5, 45. The "URL" to which Plaintiff refers is the website address that an individual visited.[8]

Plaintiff alleges that because "the FID alone is capable of identifying the particular user by his or her Facebook profile," Meta can determine what videos a BYUtv account holder requested or obtained. *Id.* ¶¶ 6, 46-51. Plaintiff claims that "[a]pproximately seven-in-ten U.S. citizens have a Facebook profile—all of whom provided the same personal information to Meta when creating their Facebook profiles," although he does not address whether any Facebook users provided pseudonymous or inaccurate personal information in creating their profiles.

### C. Plaintiff's Alleged Experiences and Disclosures to Facebook

Plaintiff alleges that he has been "a subscriber of [BYUtv] since approximately 2015," and "a Facebook user with a unique Facebook profile page during the entire class period." *Id.* ¶ 71. According to Plaintiff, "[d]uring the relevant period … [his] Facebook profile included publicly available information specifically and uniquely identifying him, including but not limited to his full name, his photograph, his hometown, and education." *Id.* ¶ 73. The Complaint alleges that by "registering his [BYUtv] account," Plaintiff was able to watch videos "exclusively available to subscribers." *Id.* ¶ 76. Each time he did so, Plaintiff claims, BYU "disclosed to Meta the titles of the prerecorded audio visual materials" along with his FID. *Id.* ¶ 78. Plaintiff avers that such disclosure "was knowing and deliberately done to increase Defendant's opportunities to display effective advertising to Plaintiff . . . and users like Plaintiff . . . in the future." *Id.* ¶ 79.

---

[8] *See, e.g.*, https://www.byutv.org/e0d2131a-3bfd-43b8-823c-464d43a8218b/the-chosen-promises.

Plaintiff alleges that he "requested or obtained prerecorded, previously aired episodes of 'Music & the Spoken Word' as well as many others," although he does not provide any specifics around these alleged requests, such as when they were made or the identity of any other materials he supposedly requested or obtained. *Id.* ¶ 77. Plaintiff also does not identify any actual harm he personally suffered from any alleged sharing of his viewing information on BYUtv. Nevertheless, he seeks statutory damages for himself and all Facebook users in the United States who requested or obtained video on the BYUtv website from November 5, 2022 to the present. *Id.* ¶¶ 81–82. The VPPA authorizes statutory damages of $2,500 per person. *See* 18 U.S.C. § 2710(c)(2)(A).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* Although a court generally must accept as true the allegations in a complaint, this rule is "inapplicable to legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also In re Myriad Genetics, Inc.*, No. 2:19-cv-0707, 2021 WL 977770, at *6 (D. Utah Mar. 16, 2021) ("naked assertions devoid of further factual enhancement" are insufficient).

If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown . . . that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)) (cleaned up). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task" that requires a court "to draw on its

judicial experience and common sense." *Id*. "In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." *In re Myriad Genetics*, 2021 WL 977770, at *5. At the motion to dismiss stage, the Court "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Id.*

## ARGUMENT

### I. BYU is not a "Video Tape Service Provider" Under the Meaning of the VPPA.

The Complaint fails first because it does not adequately allege that BYU fits the VPPA's criteria for being a "video tape service provider," or "VTSP." Under the VPPA, "'video tape service provider' means any person, *engaged in the business*, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). Plaintiff's conclusory recitals of the statutory language fail to plausibly allege that BYU, a religious university, offers video streaming as anything other than a peripheral service, distinct from its core mission to educate students. Nothing in the Complaint supports concluding that BYU is an entity engaged in the business of renting, selling, or delivering videos, rather than rather than a religious educational institution that also operates a non-profit media charity offering, BYUtv.

#### A. Providing Videos Must be a Primary Business Focus of a VTSP.

Courts analyzing the VPPA make clear that in the statutory context, "'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the defendant's work." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (quoting various dictionaries); *accord Carroll*, *supra*, 2023 WL 4361093, at *3. By way of example, the *Vizio* court explained that "a

letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox," despite obviously "delivering" the videotape, "could not be characterized as 'engaged in *the business*' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes." *In re Vizio*, 238 F. Supp. 3d at 1221-22 (emphasis in original). The *Vizio* court went on to note that "the developers of many other products or services that might be peripherally or passively involved in video content delivery [similarly] do not fall within the statutory definition of a video tape service provider." *Id.*

Accordingly, entities offering videos as ancillary parts of their business' messaging or marketing strategies are *not* VTSPs because their core business is not "tailored" to delivering videos. Courts routinely dismiss complaints that attempt to extend the VPPA to entities who offer videos in furtherance of an unrelated, primary business. For example, in *Carroll v. General Mills, Inc.*, *supra*, the district court dismissed a complaint alleging that Betty Crocker and General Mills violated the VPPA by using the Meta Pixel to transmit identifying information about a plaintiff who viewed cooking videos on their respective websites. *See* 2023 WL 4361093, at *1. The court held that the allegations about "General Mills' business are conclusory and, at most, indicate that General Mills provides videos as a peripheral part of its marketing strategy." *Id.* at *3. As the court explained, "[t]he videos on the website are part of Defendant's brand awareness, but they are not Defendant's particular field of endeavor. Nothing suggests that Defendant's business is centered, tailored, or focused around providing and delivering audiovisual content." *Id.* at *4.

Similarly, in *Tawam v. Feld Entertainment Inc.*, the court rejected attempts to apply the VPPA to a corporation that "own[ed] and promote[d] . . . monster truck events and rallies across

the United States" and hosted videos related to those events on its website. 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023). Plaintiffs argued that because "[p]art of Defendant's business involves increasing its brand presence via the use of videos" and "monetizing videos," the defendant was a VTSP. But the court disagreed, holding that the videos were "peripheral to Defendant's business," such that the plaintiff failed to "plausibly allege that Defendant is a video tape service provider." *Id.* (cleaned up).

And in *Cantu v. Tapestry, Inc.*, the court similarly rejected as "insufficient" allegations that "Defendant's 'business model involves monetizing instances in which consumers watch videos.'" No. 22-CV-1974-BAS-DDL, 2023 WL 4440662, at *8 (S.D. Cal. July 10, 2023) (granting motion to dismiss in part). Such allegations, the court held, were "conclusory." Finally, in *Christopherson v. Cinema Ent. Corp.*, the court held that an entity providing movie trailers on its website "in order to advertise the movies it sells"—its primary business—was not a VTSP. No. 23-CV-3614, 2024 WL 4492021, at *6 (D. Minn. Sept. 17, 2024) (concluding that the term "delivery" in the VPPA "require[s] a transfer of some possessory interest in the audio visual materials being . . . delivered," and that merely providing "access to such materials" does not constitute "delivery" and does not make a party a VTSP), *appeal filed sub nom. Gina Christopherson v. Cinema Ent. Corp.* No. 24-3042 (8th Cir. Oct. 7, 2024).

Thus, providing online videos that are peripheral or secondary to an organization's primary endeavor or mission does not qualify it as a VTSP under the VPPA because such an organization is not "engaged in the business" of renting, selling, or delivering videos. 18 U.S.C. § 2710(a)(4).

**B. BYUtv Entertainment is Peripheral to BYU's Educational Business.**

Plaintiff fails to allege facts that offering free video streaming is one of BYU's "particular fields of endeavor," as opposed to an ancillary part of its operations. Plaintiff makes only two allegations about BYU's business. First, he states that "BYU operates www.byutv.org, its streaming service through which it solely offers audio visual materials such as prerecorded television series and full-length feature films, some of which are licensed from third parties, and some of which are original productions of BYUtv." Compl. ¶ 2. Second, he recites the statutory language to claim that BYU "is a 'video tape service provider' as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering prerecorded audio visual materials" that "affect interstate or foreign commerce" and "[s]pecifically … operates a website which hosts videos accessible by website visitors, and the audio visual material is related to Defendant's business (as opposed to an unrelated third party) and makes up part of Defendant's business." *Id.* ¶ 93.

Such conclusory allegations are not enough. *See, e.g.*, *Cantu*, 2023 WL 4440662, at *8; *Carroll*, 2023 WL 4361093, at *3. The focus of BYU's "business" is providing faith-based education to tens of thousands of students. Offering religious programming and values-based entertainment on BYUtv is peripheral to its educational mission—just as were the videos that supported a company's brand awareness and marketing in *Carroll*, *Cantu, Tawam,* and *Christopherson*. Plaintiff alleges no facts suggesting that a meaningful focus of BYU's educational "business" involves renting, selling, or delivering video content. Plaintiff may not satisfy his pleading requirements merely by inserting BYU into the VPPA's definition of a VTSP and concluding, without more, that BYU is one. *Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of

action will not do.") (citation omitted) (cleaned up). Put another way, BYU is a university, not a video tape service provider like Blockbuster, Hulu, or Netflix.

Reading the definition of a VTSP to encompass entities like BYU would contravene both the statutory language's ordinary meaning and Congress' intent because it could mean that virtually any organization that offers videos on its website would qualify as a VTSP. In general, "[t]he plain meaning of [a statute] should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (cleaned up). Here, the VPPA applies only to those "*engaged in the business*" of renting, selling, or delivering videos. On its face, that language logically precludes extending the VPPA to a nonprofit religious university that provides videos as *a peripheral part of* its operations. Indeed, such an extension would exceed the limited problem of intentional revelations that "motivated [the VPPA's] passage"—a video store clerk handing to a reporter a list of videos Judge Bork rented. *In re Nickelodeon*, 827 F.3d at 284.

No court has interpreted the VPPA's "engaged in the business of" language broadly enough to conclude that a church, university, or similar institution is a VTSP.[9] That makes sense, because such institutions are not engaged in the same types of business as video streaming platforms (or video stores), *even when they offer videos*. Many such institutions offer extensive media online. For example, the Episcopal Church's website contains a "Storytelling" page on its website with numerous videos about its religious teachings.[10] Similarly, the Library of Congress

[9] In fact, BYU has not identified *any* decisions, in federal or state court, holding that a religious, non-profit, or educational institution is a VTSP under the VPPA.
[10] *See* The Episcopal Church, "Storytelling," https://www.episcopalchurch.org/storytelling/video/.

hosts videos of events connected to its scholarship and preservation activities.[11] The American Museum of Natural History hosts videos about its exhibits and studies it supports.[12] And nearly every university includes some video on its website.[13] It strains credulity to say that any of these institutions is "engaged in the business" of delivering video. But under Plaintiff's interpretation, all of them would be subject to the VPPA simply because they offer videos online.

Put simply, the mere fact that BYUtv provides access to online videos as a peripheral part of BYU's operations does not make BYU a VTSP. Such an outcome would far exceed Congress' intent to prevent businesses that exist to make profits from offering videos (e.g., potentially sensitive, racy, or controversial entertainment) from sharing information about their customers' viewing choices. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage."). Thus, Plaintiff's claim must be dismissed because BYU is not a VTSP.

## II. Plaintiff Does Not Allege BYU Knowingly Disclosed PII to Facebook.

Even if the Complaint adequately alleged that BYU is a VTSP (it does not), the Complaint still fails because it pleads no facts alleging that *BYU* disclosed Plaintiff's identity. The only identifying information that Plaintiff claims is PII "transmitted" to Facebook is an FID, which is allegedly matched to website interaction information. Compl. ¶¶ 42–43. While Plaintiff

---

[11] *See* Library of Congress, "Event Videos," https://www.loc.gov/collections/event-videos/about-this-collection/.
[12] *See* Am. Museum of Nat. Hist., "Videos," https://www.amnh.org/explore/videos.
[13] *See, e.g.*, Harvard Graduate Sch. of Educ., "Global Education Innovation Initiative," https://globaled.gse.harvard.edu/videos (videos of forums, training programs, lectures, and similar content offered by Harvard University).

at first claims that “the records BYU shares with Meta contain . . . a subscriber’s FID” (Compl. ¶ 5), his ensuing allegations more accurately show that (1) *Facebook creates* the FID, (2) the transmission of an FID occurs though the “c_user” cookie that *Facebook created and placed* on Plaintiff’s browser (not BYU’s server), and (3) BYU did not know, and could not access, Plaintiff’s FID. *See* Compl. ¶¶ 44, 49–51, 65, 78.

Plaintiff’s allegations rely on the supposed transmission of his FID to Facebook. *See, e.g.*, Compl. ¶ 5. But Plaintiff does not allege that he ever provided BYU with his FID or any other information about his Facebook account. Rather, Plaintiff alleges that he provided BYU only “his first name, last name, and email address.” *Id.* ¶ 11. Nor does Plaintiff allege that BYU obtained or had access to Plaintiff’s FID some other way. To the contrary, the Complaint’s allegations show that Facebook creates the FID and that the transmission of such FIDs occur though the “c_user” cookie that Facebook created and placed on Plaintiff’s browser. *See id.* ¶ 5 (the FID is “a number assigned to each Facebook profile which, by itself, makes the profile identifiable.”); *id.* ¶ 49 (“The FID is displayed as a numeric value referred to as the “c_user.”); *id.* ¶ 65 (“[The Meta Pixel] relies on Facebook cookies, which enable [Meta] to match your website visitors to their respective Facebook User accounts.”); and *id.* ¶ 78 (the c_user cookie “contain[ed]” Plaintiff’s FID).

Because Plaintiffs’ FIDs were stored in Facebook’s c_user cookie, BYU had no way of accessing them. That is how cookies work: “[t]he only servers that can access a particular cookie are those associated with the domain that wrote the cookie. That means that [a website] can read only [its own] cookies, and it cannot read . . . facebook.com cookies.” *In re Hulu Priv. Litig.,* No. C 11-03764 LB, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014) (citation omitted). Various

federal decisions have made the same observation at the motion to dismiss stage, including cases addressing disclosures of consumers' FIDs. *See, e.g.*, *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 664 (S.D.N.Y. 2015) ("In particular, through its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID."); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015) (communications through browser internet cookies were between the user and Google, who placed the cookies).

The following diagram, based on the facts as alleged in Complaint, illustrates that the user, not BYU, transmitted the FID along with video and web interaction information to Facebook:




Thus, even taking Plaintiff's allegations as true, it is undisputed that BYU does not know, does not receive, does not store, and does not disclose anyone's FID, which is the only identifying information allegedly transmitted to Facebook.[14]

[14] While Plaintiff alleges he has been a subscriber of BYUtv since approximately 2015 and a Facebook user during the relevant class period, Compl. ¶ 71, Plaintiff's allegation that BYU shared his PII is not plausible based on the facts as pleaded because Plaintiff "does not even allege that [he]

Plaintiff's failure to allege that BYU knew or could even access his FID forecloses his VPPA claim because a party cannot disclose information it does not possess. *See Eichenberger*, 876 F.3d at 986 (rejecting VPPA claim where the defendant "never disclosed and apparently never even possessed" the information that would allow a third party to identify an individual); *Yoder v. Ingersoll-Rand Co.,* 31 F. Supp. 2d 565, 571 (N.D. Ohio 1997) ("It is a logical impossibility for a party intentionally to disclose information that it does not know it has."), *aff'd*, 172 F.3d 51 (6th Cir. 1998). Plaintiff's own allegations about how the FID and c_user cookie work therefore contradict his conclusory allegation that BYU "disclosed" them; BYU could not, and did not, under Plaintiff's own recitation of how FIDs work.

Even if Plaintiff meant to allege that BYU's placing the Meta Pixel on its website "caused" the disclosure of his FID to Facebook (he does not actually allege this), BYU could not be liable under the VPPA. "Causing" a disclosure is not actionable under the VPPA; when Congress wants to prohibit "causing" a disclosure, rather than making one directly, it says so explicitly. *See, e.g.,* 15 U.S.C. § 6821 (prohibiting any person to "cause to be disclosed . . . customer information of a financial institution"); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, or to cause the disclosure of, classified information"). Congress used no such language here, as it was not concerned with unintentional, passive disclosures when it passed the VPPA. It was concerned with the limited problem of intentional revelations like the one that "motivated its passage." *In re Nickelodeon*, 827 F.3d at 284.

---

was signed into his . . . own Facebook account when visiting the [BYUtv] Website" (which is necessary for the Meta Pixel to work). *See Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1308 (N.D. Fla. 2023) (dismissing VPPA claim for failure to plead sufficiently that the defendant "has disclosed (or will disclose) any of [the plaintiffs'] own PII to any third party.").

Further, the Complaint does not allege that BYU knew it was disclosing information about a statutory "subscriber." The VPPA's private right of action allows suit against a VTSP that "*knowingly* discloses, to any person, personally identifiable information concerning any consumer." 18 U.S.C. § 2710(b)(1) (emphasis added). The VPPA's plain text thus requires that a VTSP have *actual knowledge* both that (1) personally identifiable information is being disclosed and (2) it concerns a subscriber. *See United States v. Morris*, 928 F.2d 504, 507 (2d Cir. 1991) ("[W]ith many statutes, a mental state adverb adjacent to initial words has been applied to phrases or clauses appearing later in the statute without regard to the punctuation or structure of the statute."); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist*., 842 F.3d 430, 436-37 (6th Cir. 2016) (distributing "knowingly" across both elements of the reverse-false-claims provision of the False Claims Act). As used in the VPPA, "the term 'knowingly' connotes actual knowledge." *In re Hulu Priv. Litig.,* 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

Plaintiff does not allege that BYU had actual knowledge that it was disclosing information concerning a "subscriber." He alleges that BYU "knowingly discloses information that includes a subscriber's [FID] … coupled with the title of the prerecorded audio visual material subscribers request or obtain from the Website," which allows Meta to "view the particular subscriber's corresponding Facebook profile." Compl. ¶¶ 5-6; *see id.* ¶ 59 (BYU "knew the Pixel discloses PII to Meta.").[15] However, these allegations do not indicate that BYU can or does know whether any particular person who visits byutv.org also happens to be a BYU

[15] Plaintiff devotes paragraphs to Meta's marketing materials about the Pixel, but nothing in those allegations indicates that BYU could or did know whether anyone visiting its website is both a BYUtv "subscriber" and a Facebook user, or even that BYU read those marketing materials.

account holder (and a logged-in Facebook account holder).[16] Nor could they, given they do not allege that signing in is required to view any video (because it is not). Accordingly, nothing in the Complaint suggests that BYU has any way of knowing whether a person viewing videos is a "subscriber" as opposed to someone "merely view[ing] videos while surfing the web." *M. K. v. Google LLC*, No. 21-CV-08465-VKD, 2023 WL 4937287, at *5 (N.D. Cal. Aug. 1, 2023).

Without knowledge that a viewer of its publicly available videos is or is not a "subscriber," there can be no "knowing" disclosure under the VPPA's plain text. *See In re Hulu*, 86 F. Supp. 3d at 1095 ("'[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code."). At best, Plaintiff alleges BYU knows that if someone who happens to be Facebook user *and* a BYUtv account holder watches a BYUtv video, their viewing information will be shared with Facebook *if* they are logged into Facebook at the time of viewing—because that process occurs when any Facebook member watches a BYUtv video. But such "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal" knowledge, is distinct from "actual" knowledge. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184-85 (2020) (observing "[l]egal dictionaries give actual knowledge the same meaning: real knowledge as distinguished from presumed knowledge or knowledge imputed to one") (cleaned up); *see also Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1054 (9th Cir. 2020) (distinguishing "actual knowledge" from "lower knowledge thresholds" such as "presumed" or "implied" knowledge). Accordingly, Plaintiff fails to plead a knowing disclosure of PII.

[16] The Complaint only fleetingly alludes to this, but a Facebook user must be *logged in to Facebook* at the time of accessing BYUtv for the Pixel to fire. *See* Compl. ¶ 48, fn. 17. Otherwise, the technology has no way of "knowing" that a Facebook user is visiting BYUtv such that any information should be sent back to Facebook.

## III. By Signing Up for Facebook and Expressly Agreeing to Its Policies, Plaintiff Consented to Disclosure.

Finally, the Complaint fails because Plaintiff consented to any alleged data sharing through his agreements with Facebook. The VPPA contains an exception permitting a VTSP to disclose PII with "informed, written consent" in "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). Plaintiff provided such consent when he signed up for and used Facebook. Here, in agreeing to the Facebook Privacy Policy and Cookies Policy, Plaintiff received notice of and consented to Facebook's receipt of his browsing data via the Meta Pixel. Indeed, courts have found such consent to terms and conditions and privacy policies to bar similar privacy claims. *See, e.g.*, *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (granting motion to dismiss on privacy claims where claimant agreed to privacy policy and terms and conditions that spelled out the sharing of personal information to third parties); *Javier v. Assurance IQ, LLC*, No. 4:20-cv-02860, 2021 WL 940319, at *4 (N.D. Cal. Mar. 9, 2021) (same).

Plaintiff alleges that he has "been a Facebook user with a unique Facebook profile page during the entire class period" and that "[w]hen he created his Facebook profile, Meta required Plaintiff Garcia to provide: his name, date of birth, gender, contact information, and password." Compl. ¶¶ 71–72. To be a Facebook account holder, Plaintiff necessarily had to agree to Facebook's Terms of Service, Privacy Policy, and Cookies Policy[17] which likewise disclosed (and

---

[17] These policies may be considered under the incorporation by reference doctrine because the Complaint's claims rely on their contents. *Abady*, 2023 WL 2933080, at *1. This is particularly clear because Plaintiff includes the Facebook sign up flow (*see* Compl. ¶ 36 diagram 1), which specifically references the Facebook Terms, Privacy Policy, and Cookies Policy; Plaintiff also includes allegations about his agreements in signing up for Facebook. *See* Compl. ¶¶ 71-72. Alternatively, the

obtained consent for) the activities about which he complains.[18] By accepting these policies, Plaintiff expressly acknowledged and agreed to the use of the Meta Pixel by websites such as BYUtv.

The Facebook Privacy Policy, which must be and is accepted by all Facebook users (including Plaintiff), expressly states that Facebook collects "[i]nformation from Partners, vendors and other third parties" and that these parties "collect your information when you visit their site or app or use their services."[19] The Facebook Privacy Policy also explicitly references the Meta Pixel by including within the "examples of information that we [Facebook] receive about you . . . [w]ebsites you visit and cookie data, like through the . . . Meta Pixel" and indicates that "businesses might put one of our Business Tools, the Meta Pixel, on their website."[20]

The Facebook Privacy Policy also includes links with information about how Facebook's partners use "Business Tools," including the Meta Pixel, to "integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services."[21] U.S. Facebook users are specifically advised that "[a]dvertisers, app developers, and publishers and other partners can send us information for business purposes including through . . . the Meta pixel," and thereby "provide information about your activities on and off [Meta] products—including information about your device, websites you

---

Court may take judicial notice of these policies as their authenticity is not in dispute. *Abady*, 2023 WL 2933080, at *1.

[18] *See* Facebook.com, "Create a new account," https://www.facebook.com/reg/ ("By clicking Sign Up, you agree to our Terms, Privacy Policy and Cookies Policy."); Compl. ¶ 36 diagram 1.

[19] The version of the Privacy Policy in effect at the time the Complaint was filed contains this language. *See* Facebook.com, "Privacy Policy," *Information from partners, vendors and other third parties*, https://www.facebook.com/privacy/policy/version/25238980265745528/.

[20] *Id.*

[21] Facebook.com, "The Meta Business Tools," https://www.facebook.com/help/331509497253087/ (linked from the Facebook Privacy Policy).

visit, . . . your online . . . actions."[22] Finally, the Facebook Privacy Policy includes links to additional pages providing detailed information about how the Meta Pixel works, what information it gathers and shares,[23] and how to manage and delete any private information.[24]

Similarly, the Facebook Cookies Policy[25] provides detailed descriptions of how Facebook's cookies and pixels are used by websites like BYUtv. For example, the Cookie Policy explains that partnering websites might use Facebook cookies or pixels to:

- "help deliver ads to people who have previously visited a business's website, purchased its products or used its apps and to recommend products and services based on that activity"; and
- "help measure the performance of ad campaigns for businesses that use the Meta Products," including "to measure how often people do things, such as make a purchase following an ad impression."[26]

The Facebook Cookies Policy sets forth the purpose of the "c_user" cookie specifically referenced in the Complaint (*see* Compl. ¶¶ 47–51, 78), which is a cookie placed on a user's browser to "authenticate" the user "so you don't have to keep logging in to Facebook."[27] The Facebook Cookies Policy again references the Meta Pixel as a Business Tool that organizations use to "share information with [Facebook]."[28] Finally, the Facebook Cookies Policy provides a link with

---

[22] Facebook.com, "United States Regional Privacy Notice," https://www.facebook.com/privacy/policies/uso/version/7618662088232896, linked from the Privacy Policy.
[23] Facebook.com, "Meta Pixel" https://www.facebook.com/business/tools/meta-pixel, linked from the "Meta Business Tools," *supra*.
[24] Facebook.com, "Privacy Policy," *How you can manage or delete your information and exercise your rights*, https://www.facebook.com/privacy/policy.
[25] Facebook.com, "Cookies Policy," § "Advertising, recommendations, insights and measurement," https://www.facebook.com/privacy/policies/cookies/.
[26] *Id.*
[27] *Id.* § "Why do we use cookies?"
[28] *Id.* § "How can you control your information?"

instructions on how to access, manage, and prevent information shared with Facebook via the Meta Pixel from third-party websites.[29]

These express agreements with Facebook satisfy the VPPA's consent exception and foreclose any plausible allegation that Plaintiff did not know (or could not have known) about, and did not consent to, use of the Meta Pixel by third-party websites (including BYUtv) to share web interaction information with Facebook. First, there can be no dispute that these agreements are "distinct and separate" from any agreements Plaintiff entered into with BYU. *See* 18 U.S.C. § 2710(b)(2)(B)(i) (setting forth the "distinct and separate" form requirement). Second, Plaintiff has alleged that he used Facebook during the entire two-year class period and therefore provided consent within two years. *See* Compl. ¶ 82; 18 U.S.C. § 2710(b)(2)(B)(ii) (allowing consent to be obtained at the election of the consumer when it is "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner"). Third, BYUtv's Privacy Policy[30] (which is also expressly referenced in the Complaint) instructs users that they can reset their browser to refuse cookies if they don't want information shared—i.e., how to withdraw from ongoing disclosures. *See* Compl. ¶ 26, n.6; 18 U.S.C. § 2710(b)(2)(B)(iii) (requiring that consumers be "provided an opportunity, in a clear and conspicuous manner . . . to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election.").

Thus, Plaintiff's claims fail because he provided informed, written consent under the VPPA.

[29] Facebook.com, "Review your activity off Meta technologies," https://www.facebook.com/help/2207256696182627, linked from the Facebook Cookies Policy.
[30] BYUtv, Privacy Policy, https://www.byutv.org/privacy.

## CONCLUSION

BYU is not a VTSP because it is not "engaged in the business" of renting, selling, or distributing audio visual content. Furthermore, BYU has never had access to, and therefore has never disclosed, Plaintiff's Facebook ID to Facebook or any third party, and the Complaint does not plausibly allege any facts supporting such a conclusion. And because Plaintiff agreed to Facebook's privacy policies, and those policies plainly disclose the practices at issue here, the Complaint fails to allege any unlawful disclosure to, or interception by, Facebook of Plaintiff's BYUtv activity and identifying information. For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiff's Complaint.

Dated: January 17, 2025

Respectfully submitted,

**RAY QUINNEY & NEBEKER P.C.**

By: /s/ James S. Jardine
James S. Jardine (UT Bar No. 1647)
jjardine@rqn.com
Michael K. Erickson (UT Bar No. 12503)
merickson@rqn.com

**ZWILLGEN PLLC**
Michael Bleicher (*pro hac vice* forthcoming)
michael.bleicher@zwillgen.com
Jeff Landis (*pro hac vice* forthcoming)
jeff@zwillgen.com

*Attorneys for Defendant*
*Brigham Young University*