**CARNEY BATES & PULLIAM, PLLC**
Allen Carney (*pro hac vice*)
acarney@cbplaw.com
Hank Bates (*pro hac vice*)
hbates@cbplaw.com
Samuel Randolph Jackson (*pro hac vice*)
sjackson@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: 501.312.8500
Facsimile: 501.312.8505

Mark Reich (to apply for *pro hac vice*)
mreich@zlk.com
Gary Ishimoto (to apply for *pro hac vice*)
gishimoto@zlk.com
**LEVI & KORSINSKY LLP**
33 Whitehall Street, 17th Floor
New York, NY, 10004
Tel: 212-363-7500

Jacob D. Barney (#16777)
**ANDERSON & KARRENBERG**
50 W. Broadway, Suite 600
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Fax: (801) 364-7497
jbarney@aklawfirm.com

*Attorneys for Plaintiff and Class*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH – CENTRAL DIVISION**

| | |
|---|---|
| BENJAMIN GARCIA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHAM YOUNG UNIVERSITY d/b/a BYU BROADCASTING<br><br>Defendant. | **PLAINTIFF BENJAMIN GARCIA'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Judge: Hon: Ann Marie McIff Allen<br><br>Mag. Judge: Hon. Daphne A. Oberg<br><br>Case No.: 1:24-cv-00188-AMA |

Plaintiff, through counsel, submits his memorandum in opposition to Defendant's Motion to Dismiss.

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........ ii, iii, iv

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

III. LEGAL STANDARD ........ 4

IV. ARGUMENT ........ 4

A. BYU is a Video Tape Service Provider ........ 4

B. BYU Knew Its Use of The Pixel Would Disclose Its Subscribers' PII to Meta ........ 10

C. BYU's Consent Argument Is Improper and Unavailing ........ 16

i. *BYU Failed to Obtain Informed Written Consent* ........ 17

ii. *Meta's Terms Are Not In A Form Separate and Distinct From Other Obligations* ........ 19

iii. *Neither BYU's Nor Meta's Terms Provide Plaintiff The Opportunity To Withdraw From Such Disclosures* ........ 20

iv. *Additional Considerations* ........ 21

V. CONCLUSION ........ 23

# TABLE OF AUTHORITIES

Page(s)

Cases

31 F.Supp.2d 565 (N.D. Ohio 1997) ..... 20
86 F.Supp.3d 1090 (N.D. Cal. 2015) ..... 21
*Abady v. Lipocine Inc.*,
No. 2:19-CV-00906, 2023 WL 2933080 (D. Utah Apr. 13, 2023) ..... 23
*Ambrose v. Boston Globe Media Partners LLC*,
No. CV 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022) ..... 10
*Applied Predictive Technologies, Inc. v. MarketDial, Inc.*,
598 F.Supp.3d 1264 (D. Utah 2022) ..... 26
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 9, 10
*Aust*,
*in-Spearman v. AMC Net. Enter. LLC*, 98 F.Supp.3d 662 (S.D.N.Y. 2015) ..... 19
*Belozerov v. Gannet Co., Inc.*,
646 F.Supp.3d 310 (D. Mass. 2022) ..... 10, 16
*Calhoun v. Google*,
113 F.4th 1141 (9th Cir. 2024) ..... 28
*Cantu v. Tapestry, Inc.*,
No. 22-CV-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023) ..... 14
*Cappello v. Walmart Inc.*,
No. 3:18-cv-6678, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ..... 25
*Carroll v. General Mills, Inc.*,
No. CV-23-1746 DSF (MRWx), 2023 WL 4361093 (C.D. Cal. June 26, 2023) ..... 13
*Christopherson v. Cinema Ent. Corp.*,
No. 23-C-3614, 2024 WL 4492021 (D. Minn. Sept. 17, 2024) ..... 14
*Collins v. Toledo Blade*,
720 F.Supp.3d 543 (N.D. Ohio 2023) ..... 14
*Czarnionka v. Epoch Times Assoc., Inc.*,
No. 22 Civ. 6348 (AKH), 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ..... 18, 19, 20
*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ..... 19
*Fan v. NBA Properties Inc.*,
No. 23-CV-05069-SI, 2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) ..... 27
*Feldman v. Sta*,
*r Trib. Media Co. LLC*, 659 F. Supp. 3d 1006 (D. Minn. 2023) ..... 17, 27
*Feldman*,
659 F.Supp.3d 1023 ..... 24
*Fernandez v. Clean House LLC*,
883 F.3d 1296 (10th Cir. 2018) ..... 27, 28
*GameStop*,
2024 WL 708589 ..... 19

*Ghanaat v. Numerade Labs, Inc.*,
689 F.Supp.3d 714 (N.D. Cal. 2023) .......... 16
*Golden v. NBCUniversal Media, LLC*,
688 F.Supp.3d 150 (S.D.N.Y. 2023) .......... 12, 16, 17, 21
*Hancock v. American Tel. and Tel. Co., Inc.*,
701 F.3d 1248 (10th Cir. 2012) .......... 23
*Harris v. Public Broadcasting Service*,
662 F.Supp.3d 1327 (N.D. Ga. 2023) .......... 14, 16, 20
*In re Facebook, Inc., Intern. Track. Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 18
*In re Google Cookie Placement Cons. Priv. Litig.*,
806 F.3d 125 (3rd Cir. 2015) .......... 18
*In re Hulu Privacy Litig.*,
No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... passim
*In re Meta Pixel Healthcare Litig.*,
647 F.Supp.3d 778 (N.D. Cal. 2022) .......... 23
*In re Nickelodeon Cons. Priv. Litig.*,
827 F.3d 262 (3rd Cir. 2016) .......... 19
*In re Vizio Cons. Priv. Litig.*,
238 F.Supp.3d 1204 (C.D. Cal. 2017) .......... 11, 12, 13
*Jackson v. Fandom, Inc.*,
No. 22-cv-04423-JST, 2023 WL 4670285 (N.D. Cal. July 20, 2023) .......... 20
*Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*,
633 F.3d 1022 (10th Cir. 2011) .......... 9
*Lebakken*,
640 F.Supp.3d 1335 .......... 20
*Li v. Georges Media Group LLC*,
No. 23-1117, 2023 WL 7280519 (E.D. La. Nov. 3, 2023) .......... 18, 21
*M.S. v. Premera Blue Cross*,
No. 2:19-cv-00199, 2020 WL 1692820 (D. Utah Apr. 7, 2020) .......... 9, 10
*Mata v. Zillow Grp., Inc.*,
No. 24-CV-01095-DMS-VET, 2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) .......... 10
*Mendoza v. Caesars Ent., Inc.*,
No. 23-CV-03591, 2024 WL 2316544 (D.N.J. May 22, 2024) .......... 17
*Miller v. Glanz*,
948 F.2d 1562 (10th Cir. 1991) .......... 23
*Pileggi v. Washington Newspaper Publ'g Co.*, LLC,
No. CV 23-345 (BAH), 2024 WL 324121 (D.D.C. Jan. 29, 2024) .......... 27
*Robison v. 7PN, LLC*,
569 F.Supp.3d 1175 (D. Utah 2021) .......... 27
*Robison*,
569 F.Supp.3d .......... 27
*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .......... 7, 10, 12
*Saunders v. Hearst Television, Inc.*,
711 F.Supp.3d 24 (D. Mass. 2024) .......... 17

*Sellers v. Bleacher Report, Inc.*,
No. 23-cv-00368-SI, 2023 WL 4850180 (N.D. Cal. Jul. 28, 2023) .............................. 12, 14, 18
*Tawam v. Feld Entertainment Inc.*,
684 F.Supp.3d 1056 (S.D. Cal. 2023) ............................................................................ 14
*Warnick v. Cooley*,
895 F.3d 746 (10th Cir. 2018) ........................................................................................ 10

Statutes

18 U.S.C. § 2710(a)(4) ............................................................................................. 10, 12
18 U.S.C. § 2710(b)(2) ..................................................................................................... 22
18 U.S.C. § 2710(b)(2)(B) ........................................................................................... 22, 26
18 U.S.C. § 2710(b)(2)(B)(iii) .......................................................................................... 25

## I. INTRODUCTION

Plaintiff Benjamin Garcia's ("Plaintiff") Complaint clearly articulates that Defendant Brigham Young University ("BYU" or "Defendant") violated the Video Privacy Protection Act ("VPPA"). Indeed, the Complaint incorporates actual network traffic revealing that BYU installed the Meta Pixel ("Pixel") on byutv.org ("byutv" or the "Website"), which functioned to disclose personally identifiable information of its subscribers to Meta.

Faced with such unassailable proof, BYU, in the introduction to its Motion To Dismiss Plaintiff's Complaint ("MTD"), resorts to histrionics about the volume of privacy claims filed by plaintiffs' attorneys; argues that Plaintiff seeks to impose liability on BYU for "the sharing of *any* information related to video viewing on *any* website"; engages in ad hominem attacks on plaintiff's counsel; and generally praises its own good works as grounds to avoid liability. Such efforts are nothing more than a diversion. The simple fact is that BYU unlawfully shared personal information with Meta (and by extension millions of advertisers), which was not just benign usage data, but instead consisting of intimate details of the subscribers' lives, including crises of faith, grief, depression, and addiction. Plaintiff brings this case against BYU to remedy its violations of his and the proposed class's privacy as protected by the VPPA.

Moreover, BYU's actions run afoul of both historical and modern notions of privacy. As Senator Patrick Leahy emphasized, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information." *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*: *Hearing before the S. Subcomm. on Privacy, Tech., and the Law*, 112th

Cong. 28 (2012) (statement of Patrick Leahy, Chairman, S. Comm. on the Judiciary). The VPPA makes clear that BYUtv subscribers' intimate video-viewing information is private and protected.

BYU moves to dismiss Plaintiff's Complaint on three grounds: (1) whether BYU is a VTSP, (2) whether BYU knew it was disclosing Plaintiff's PII to a third party, and (3) whether Plaintiff consented to such a disclosure. None of BYU's arguments are availing. First, BYU is undoubtedly a VTSP: BYU created a television network offering thousands of hours of video content. VTSP is a broadly defined term under the VPPA, and BYU's activity easily falls within its scope. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 548 (2d Cir. 2024) ("[B]y its plain terms, the statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies).") (emphasis in original).

Next, BYU clearly knew it was disclosing Plaintiff's PII to Meta because it (i) elected to install the Pixel for the sole purpose of sharing PII with Meta, (ii) agreed to terms that explain the Pixel uses cookies to identify unique individuals and shares URLs of the webpages they visit with Meta and (iii) received website analytics and enhanced advertising from its use of the Pixel.

Finally, although affirmative defenses are inappropriate for evaluation on a motion to dismiss, Defendant argues that somehow Plaintiff's agreement with Meta relieves it of liability for its violations of the VPPA. However, the consent scheme BYU purports to employ falls far short of the VPPA's requirements. BYU's MTD should be denied.

## II. <u>BACKGROUND</u>

BYU operates an online video-streaming platform (similar to Netflix or Hulu) called "BYUtv," which publishes a large catalog of prerecorded audio-visual content, both licensed from

third-parties, as well as content developed by BYU for BYUtv. *Id*. ¶¶ 2, 12-14. BYUtv offers a subscription through which users can view exclusive content in exchange for providing their personal information including their name and email address. *Id*. ¶¶ 11, 27, 29. BYU uses the personal information users submit when creating their accounts to send them news about shows and exclusive content. *Id*. ¶ 27.

BYU chose to install the Pixel on the BYUtv streaming platform. Compl. ¶¶ 4, 7, 41, 58. As a result, information identifying the specific videos unique users request or obtain is transmitted to Meta. *Id*. ¶¶ 5-6, 45, 48, 50-51. BYU elected that this video-viewing information be disclosed to Meta. *Id*. ¶¶ 7, 57-58, 69. When such video-viewing information is transmitted to Meta it includes two pieces of data: (i) the "event", which identifies the user's interaction with the website and includes the URL of the webpage on which the interaction occurs and (ii) an "identifier" which is the user's Facebook ID ("FID"), a unique numeric identifier assigned by Meta to each user's Facebook profile. *Id*. ¶¶ 42, 45-52. Anyone in possession of the URL can identify the video title the user requested or obtained and anyone in possession of the FID can locate the user's Facebook profile. *Id*. ¶ 6, 44, 50-51.

Meta is an advertising company, and it developed the Pixel for website owners like BYU. Compl. ¶¶ 30-40. The Pixel serves no functional purpose: It only collects data from users' online interactions and transmits such data to Meta. *Id*. ¶ 68. Website owners (not Meta) install the Pixel and program it to share categories of information with Meta. *Id*. ¶¶ 58, 69. BYU installed the Pixel for the exclusive purpose of disclosing information about its subscribers to Meta. *Id*. ¶ 68.

Plaintiff is a BYUtv subscriber and a Facebook user, whose Facebook profile possesses a unique FID. Compl. ¶ 71. As a subscriber, he watched videos on the Website. *Id*. ¶ 77. Each time

he requested or obtained a video, his video selection and PII was transmitted to Meta because BYU installed a Pixel. *Id.* ¶ 78. These transmissions to Meta included the titles of the videos he requested or obtained and his FID, making both him and the videos he selected, identifiable to Meta (or any person who possesses those two pieces of information). *Id.* Plaintiff did not consent to BYU's disclosure of his PII to Meta. *Id.* ¶ 98.

## III. <u>LEGAL STANDARD</u>

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a plaintiff's complaint alleges factual content which permits the court "to draw the reasonable inference that a defendant is liable for the misconduct alleged," a claim is plausible on its face. *Id*. The court should accept all of the well-pleaded facts in the complaint as true and construe them in the plaintiff's favor. *M.S. v. Premera Blue Cross*, No. 2:19-cv-00199, 2020 WL 1692820, at *2 (D. Utah Apr. 7, 2020) (quoting *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011)). The court is required to draw on its judicial experience and common sense in evaluating whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 679. A complaint "must give just enough factual detail to provide [a] defendant with fair notice of what the…claim is and the grounds upon which it rests." *Premera*, 2020 WL 1692820, at *2 (quoting *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018)).

## IV. <u>ARGUMENT</u>

### *A. <u>BYU is a Video Tape Service Provider</u>*

"Congress cast a wide net in defining 'video tape service provider,'" including any company "engaged in the business . . . of rental, sale *or* delivery of prerecorded video cassette

tapes or similar audio visual materials[.]" *Salazar*, 118 F.4th at 548 (emphasis in original); 18 U.S.C. § 2710(a)(4). "[B]y its plain terms, the statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies)." *Id*. (emphasis in original).

The overwhelming weight of authority supports a broad definition of "video tape service provider." *See Ambrose v. Boston Globe Media Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (finding a media organization involved in news, entertainment, and commentary which hosts thousands of videos is, for various purposes, a VTSP); *Belozerov v. Gannet Co., Inc.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) ("[T]he VPPA is not limited to entities that are primarily engaged in the business of providing video content[.]"); *Mata v. Zillow Grp., Inc.*, No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *3 (S.D. Cal. Dec. 18, 2024) (holding that a real estate platform that offered video walk throughs was a VTSP).

Given this broad definition, BYU is certainly engaged in the business of delivering audio visual materials.[1] First, BYU created a dedicated video content streaming platform called "BYU***tv***" that solely offers audio visual materials, and offers content ranging from scripted TV shows and movies,[2] to videos offering guidance on personal and sensitive subjects like faith, depression, and addiction.[3] Compl. ¶ 2. BYU is "substantially involved in the conveyance of video content to

[1] Defendant wrongly claims Plaintiff only made two allegations substantiating that BYUtv makes BYU a VTSP. *See* Compl. ¶¶ 2, 12-14, 29, 47 *Figure 21-a*, 51, 69, 74, 76, 93.

[2] MALORY TOWERS, BYUtv https://www.byutv.org/malory-towers, and LIKE MIKE, 20th Century Fox https://www.byutv.org/1ff5b762-18ef-4122-bf44-79375fb9127c/like-mike (2002).

[3] COME FOLLOW UP, *June 26-July 2 | Matthew 28; Mark 16; Luke 24; John 20-21 | Viewer Question: Believing Through Doubt*, BYUtv https://www.byutv.org/cf24d59e-ab24-4a5b-ad81-30f3ed2e829d/june-26-july-2--matthew-28-mark-16-luke-24-john-20-21--viewer-question-

consumers." *In re Vizio Cons. Priv. Litig.*, 238 F.Supp.3d 1204, 1221 (C.D. Cal. 2017). BYUtv carries over 2,000 hours of pre-recorded video content including licensed third-party content and original content BYU produced specifically for the Website. *Id.* ¶¶ 13, 14. Finally, BYUtv is "significantly tailored to serve that purpose" (*id*): BYUtv is a "streaming platform," *id*. ¶ 13, and its sole purpose is to provide "audio visual materials such as prerecorded television series and full-length feature films," *id*. ¶ 2.[4]

BYU proffers caselaw stating that "'business' connotes 'a particular field of endeavor,' i.e., a focus of the defendant's work," to suggest publication of videos must be the primary field of endeavor, but BYU stretches such opinions too far. MTD at 8. Nothing in the VPPA limits it to only companies with the single focus of selling, renting, or delivering audio visual content. *Salazar*, 118 F.4th at 548. In fact, the VPPA's plain definition of VTSP is ***not*** limited to entities exclusively, or even primarily engaged in the business of delivering audio visual materials, *In re Vizio*, 238 F.Supp.3d at 1221. *See* 18 U.S.C. 2710(a)(4).

---

believing-through-doubt; THE STORY TREK, *I Prayed He Would Die*, BYUtv https://www.byutv.org/aebfefcd-af1e-436d-864a-4f9c5fb08676/the-story-trek-i-prayed-he-would-die; FAMILY RULES, *The Family Narrative & Living with Loss*, BYUtv https://www.byutv.org/cf94e552-2693-43b8-9759-659762171a31/family-rules-the-family-narrative--living-with-loss; REAL FAMILIES REAL ANSWERS, *Avoiding/Overcoming Pornography*, BYUtv https://www.byutv.org/b933fe5c-3201-4cca-a124-e4e6492a9122/real-families-real-answers-avoiding-overcoming-pornography.

[4] These activities are a prime example of VTSP conduct. *See In re Vizio*, 238 F. Supp.3d. at 1222 (holding as VTSP a defendant which "developed a product intimately involved in the delivery of video content to consumers, has created a supporting ecosystem to seamlessly deliver video content to consumers (including entering into agreements with content providers. . .) to enable consumers to access their programming[,] . . .and has marketed its product" to connect consumers with video content).

Indeed, as stated above, courts *routinely* find that entities are VTSPs when they offer prerecorded audio visual materials as "*part* of [their] book of business," regardless of additional focuses or alternative revenue streams. *Salazar*, 118 F.4th at 549 (emphasis in original). "[C]ourts have held that websites that provide video content as well as other media content – including news organizations – are [VTSPs] under the VPPA." *Sellers v. Bleacher Report, Inc.*, No. 23-cv-00368-SI, 2023 WL 4850180, at *6 (N.D. Cal. Jul. 28, 2023) (collecting cases)*; see also Golden v. NBCUniversal Media, LLC*, 688 F.Supp.3d 150 (S.D.N.Y. 2023); and *In re Vizio*, 238 F.Supp.3d at 1221.

BYU worries that violations of the VPPA by religious, non-profit, or educational institutions could lead to litigation, but of course, such concerns provide no insulation from violations of privacy rights. As the court noted in *In re Vizio*:

> Defendants also resort to parade of horribles, arguing that if Vizio is considered a video tape service provider, "[c]ountless products and services," such as "shipping services, Blu–Ray players, smartphones, app stores, cable boxes, wireless routers, personal computers, video game consoles, and even cars" would also fall within the statutory definition of video tape service providers. (Mem. at 16; Reply at 5–7.) But the statute's text once again alleviates Vizio's concerns. Most of these products or services are far too peripherally or passively involved in the delivery of video content to reasonably constitute "the business" of delivering video content. By contrast, Plaintiffs allege that Vizio has developed a product intimately involved in the delivery of video content to consumers, has created a supporting ecosystem to seamlessly deliver video content to consumers (including entering into agreements with content providers such as Netflix and Hulu), and has marketed its product to consumers as a "passport" to this video content.

238 F.Supp.3d at 1222.

Equally unavailing is BYU's argument that it is not a VTSP because it videos are "*ancillary* parts of [its] business' messaging or marketing strategies" and not BYU's "core business."[5] BYU is wrong to argue that Plaintiff alleges BYUtv is part of its marketing and messaging strategy: Plaintiff squarely alleges that BYU's operation of BYUtv makes it a videotape service provider.[6] And BYU fails to support this argument with any relevant, applicable legal authorities.

What authorities BYU does offer in support of this argument are easily distinguished. Placing an advertisement on business's website does not make such business a VTSP. On the other hand, creating a website dedicated to hosting Emmy-nominated video content does. There is no need to delineate where that line falls because, wherever it is, BYU is way past it. *See* MTD at 9-10; *Carroll v. General Mills, Inc.*, No. CV-23-1746 DSF (MRWx), 2023 WL 4361093 (C.D. Cal. June 26, 2023); *Tawam v. Feld Entertainment Inc*., 684 F.Supp.3d 1056 (S.D. Cal. 2023), *Cantu v. Tapestry, Inc*., No. 22-CV-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023); and *Christopherson v. Cinema Ent. Corp.*, No. 23-C-3614, 2024 WL 4492021, at *6 (D. Minn. Sept. 17, 2024)[7] *But see Collins v. Toledo Blade*, 720 F.Supp.3d 543, 554 (N.D. Ohio 2023) (expressly rejecting *Carroll* and declining to "narrow[] the definition of a video tape service provider beyond its plain meaning[.]"). Plaintiff's allegations do not permit the conclusion that BYUtv exists to

---

[5] *In re Vizio*'s "letter carrier" example, MTD at 9, is unlike BYUtv's development and delivery of audiovisual material. A proper analogy would involve the letter carrier who developed video content, enrolled specific residences to receive such videos, delivered the videos, and then reported to Meta which houses requested which of the letter carrier's videos.

[6] Defendant conflates the issue of the disclosure of "personally identifiable information" to third parties with the issue of whether Defendant is a VTSP. Whether or not BYUtv utilized a Pixel has no bearing on its status as a VTSP.

[7] All of Defendant's authorities involve videos which are advertisements, not independent content.

"increase[] its brand presence via the use of videos," MTD at 9-10. *See Sellers*, 2023 WL 4850180, at *6.

BYU also takes the curious position that it cannot be a VTSP because it is a non-profit and identifies several other non-profits it alleges host videos on their websites. MTD at 12 n.9. But when drafting the VPPA Congress did not include puerile defenses, such as "but he did it, too." Moreover, BYU's finger-pointing at other institutions' online practices—without even arguing such entities hosted a Pixel at all—is far afield from Plaintiff's Complaint and cannot be considered on a motion to dismiss. In any event, Defendant cites no caselaw holding non-profits are exempt from the VPPA. To the contrary, VPPA cases have proceeded against non-profits. *See Harris v. Public Broadcasting Service*, 662 F.Supp.3d 1327 (N.D. Ga. 2023); and Mem. of Law in Support of Pl.'s Unopposed Mot. for Preliminary Approval of Class Action Settlement, *Moog et al. v. The Christian Broadcasting Network, Inc.*, No. 1:24-cv-00501-PTG-IDD - (E.D. Va. Sept. 8, 2024). There is no question that BYU's operation of BYUtv satisfies the scope of a VTSP under the VPPA's definition, and its attempts to suggest the VPPA does not extend to certain types of entities or is limited to "businesses that exist to make profits," MTD at 13, are completely unsupported by the plain text of the VPPA.

This entire argument is risible: the product at issue *has "tv" in its name*. BYUtv's sole function is to provide entertainment via audio visual materials, which BYU refers as a "streaming platform" creating "engaging viewing experiences." *Id.* ¶ 2, 13, 13 fn. 3 (*see* https://www.byutv.org/about). BYU partners with "production and distribution entities around the globe" to extend the reach of its streaming platform worldwide. *Id.* Its content has been so

successful that it was recently nominated for eleven Emmy Awards.[8] BYU is substantially involved in the conveyance of video content to consumers through BYUtv – a website significantly tailored to deliver audio visual material; Plaintiff has extensively alleged BYUtv is a VTSP.

*B. BYU Knew Its Use Of The Pixel Would Disclose Its Subscribers' PII to Meta*

Plaintiff's Complaint makes detailed allegations describing how and why BYU's disclosure of Plaintiff's and the proposed class members' PII was done knowingly. As a threshold matter there is no reasonable dispute that BYU knew its installation of the Pixel would share its subscribers' PII because BYU agreed to Meta's Business Tools Terms[9], which unambiguously disclose that the Pixel personally identifies users, matches them with their User IDs and connects them with Event Data. The BTTs further notify Pixel users, like BYU, that it will capture "Event Data," which is "information you share about people and actions that they take on your websites[.]"

In addition to such notices, Meta instructs Pixel users to provide a "robust and sufficiently prominent notice to users regarding the Business Tool Data Collection, sharing and usage" including that "(a) third parties, including Meta, may use cookies. . .to collect or receive information from your websites. . . to target and deliver ads, (b) how users can opt-out of the collection and use of such information for ad targeting, and (c) where a user can access a

---

[8] BYUtv, Facebook (December 13, 2024) https://www.facebook.com/BYUtv/posts/we-are-beyond-thrilled-to-announce-that-byutv-has-been-nominated-for-eleven-chil/1103098477840774/; National Academy of Television Arts & Sciences, *3rd Annual Children's & Family Nominations*, (December 12, 2024) https://theemmys.tv/cafe-3rd-nominations/. Again, in these Emmy nominations, BYU finds itself squarely alongside the entities it attempts to distinguish itself from – Netflix, Hulu, Disney+, Apple TV+, and Max to name a few. *Id.* All plainly VTSPs.

[9] Meta, Meta Business Tools Terms, https://www.facebook.com/legal/technology_terms

mechanism for exercising such choice[.]"[10] Obviously, BYU's terms and conditions are not compliant with this agreement. *see infra* § IV.C.iv.

BYU agreed to these terms when it obtained the base Pixel code, and therefore knew exactly how the Pixel operates, and such behavior has been found to substantiate a VTSP's knowledge that it is disclosing PII to Meta. *See Golden*, 688 F.Supp.3d at 161-62; *Harris*, 662 F.Supp.3d at 1336; *Belozerov*, 646 F.Supp.3d at 315; and *Ghanaat v. Numerade Labs, Inc.*, 689 F.Supp.3d 714, 721 (N.D. Cal. 2023).

BYU knowingly installed the Pixel on its streaming platform, BYUtv.org. Compl. ¶¶ 1, 7. BYU knows the Pixel provides Meta with URLs containing video titles and uses cookies to match users with their Facebook accounts. *Id*. ¶¶ 50, 64-65. The Pixel transmits PII to Meta when subscribers request or obtain videos. *Id*. ¶¶ 4-5, 38, 45-52.[11] BYU installed the Pixel to obtain the benefits of enhanced marketing outcomes and analytics. *Id*. ¶¶ 7, 63. BYU benefits from its Pixel because it advertises on Facebook and receives Pixel analytics data in its Meta Events Manager page. *Id*. ¶¶ 61-63. Meta clearly explains the Pixel will "track URLs visited," "relies on Facebook cookies," and "identify website visitors and match them to their Facebook pages." *Id*. ¶¶ 64-65.

Courts overwhelmingly deny 12(b)(6) motions where a defendant operates the Pixel knowing it functions by sharing individualized interactions with Meta. *Mendoza v. Caesars Ent., Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024) (collecting cases). "Allegations plausibly showing that [PII] was consciously disclosed suffice[.]" *Feldman v. Star*

---

[10] *Id*.

[11] Whether Plaintiff pleaded he was logged into his Facebook account at the time of this unlawful transmission does not negate his allegations that his PII was, in fact, disclosed to Meta.

*Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1022 (D. Minn. 2023). "The Court must credit these pleadings at this pre-discovery stage." *Golden*, 688 F. Supp.3d at 162.

BYU endeavors to deflect from its decision to install and operate the Pixel and instead shift the focus onto anybody else. BYU first blames Meta, arguing these disclosures were caused by Meta's cookie and Meta's technology. But BYU alone obtained, configured, and activated its Pixel, Compl. ¶¶ 57-59, and BYU receives the benefits associated with the use of its Pixel through enhanced marketing and analytics. Compl. ¶ 60-63. *See Saunders v. Hearst Television, Inc.*, 711 F.Supp.3d 24, 31 (D. Mass. 2024) (holding defendant's disclosures were knowing because it received analytics data from the third party advertisers). Plaintiff also claims BYU had no *need* to install its Pixel, and only did so to receive its benefits. Compl. ¶ 68. *See In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *5 (N.D. Cal. Apr. 28, 2014) ("It is straightforward to develop a webpage that yields no communication with Facebook."). "It was not necessary to send the Facebook user cookies, and they were sent because [BYUtv] chose to include the [Pixel] on watch pages." *Id*. at *13.

BYU continues: Because the cookie belongs to Meta, BYU never possessed Plaintiff's FID and therefore necessarily could not have transmitted it. But the VPPA only regulates the "disclosure" [12] and not the "possession" of PII, and this theory has already been dismissed by

[12] *Disclose*, MERRIAM-WEBSTER, "to expose to view," https://www.merriam-webster.com/dictionary/disclose#:~:text=Legal%20Definition-,disclose,another%20or%20to%20the%20public20public (last visited Feb. 1, 2025)

courts assessing VPPA violations.[13] Presented with the defense that "transmitting cookies is just the normal way that webpages…load," the *In re Hulu* court stated:

> [t]his description—that only servers associated with the domain that writes the cookie can access that domain's cookie—does not answer the question about what Hulu knew. Instead, it only describes how servers can read cookies. Hulu may not have been able to read Facebook's cookies, but if it knew what they contained and knew that it was transmitting PII—that is, information that 'identifies a person as having requested or obtained specific video materials or services'. . . —then Hulu is liable under the VPPA.

2014 WL 1724344, at *15. The *In re Hulu* held this argument "is not enough to negate knowledge or show the absence of evidence about knowledge." *Id*. at *16. Furthermore, *Hulu's* standard is more strict than has been applied by most courts analyzing the issue, which denied motions to dismiss when presented with allegations that defendants knowingly disclosed personal information to a third party. *Li v. Georges Media Group LLC*, No. 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (quoting *Sellers*, 2023 WL 4850180, at *5; *Czarnionka v. Epoch Times Assoc., Inc*., No. 22 Civ. 6348 (AKH), 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022); and *Lebakken v. WebMD, LLC*, 640 F.Supp.3d 1335l, 1343 (N.D. Ga. 2022)). Knowing the Pixel transmits PII to Meta, BYUtv installed it on its webpages that contain video material, which sent the user's c_user cookie when the page loaded the Pixel. *Id*.

Worse still, BYU blames the *user's themselves*, because "the user, not BYU, transmitted the FID along with video and web interaction information to Facebook." MTD at 15. BYU supports this assertion with a cute, but entirely misleading diagram. *Id*. Misleading because BYU's

---

[13] Defendant's reliance on *In re Google Cookie Placement Cons. Priv. Litig.*, 806 F.3d 125 (3rd Cir. 2015) is misplaced, *In re Google* involved wiretap allegations which rely on fundamentally different elements than the VPPA and is clearly a minority holding. *See In re Facebook, Inc., Intern. Track. Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (expressly rejecting *In re Google*).

diagram skips an essential step in the process: Its decision to install the Pixel in the first place. To the contrary, Plaintiff's figure (below) reflects transmissions to Meta had BYU *not* installed its Pixel, and it illustrates that in such circumstances no information would be shared with Meta. No pixel, no disclosure of PII.




When the Pixel is active on a webpage, the user's browser has no agency in the transmission of PII. *See Austin-Spearman v. AMC Net. Enter. LLC*, 98 F.Supp.3d 662, 664 (S.D.N.Y. 2015) (finding that a company adds Facebook's technology to its website, customizes the code, and the code forces the user's browser to look for the user's Facebook ID); *In re Hulu*, 2014 WL 1724344, at *13 (same); *GameStop,* 2024 WL 708589, at *27 (same).

BYU's additional authorities are borderline nonsensical. Neither *Eichenberger v. ESPN, Inc*., 876 F.3d 979 (9th Cir. 2017) nor *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 (3rd Cir. 2016) assess the issue of a defendant's knowledge of their transmissions of PII—they both examine

a different issue: whether the information disclosed to a third party constitutes PII.[14] And BYU's proposition that it cannot disclose information it does not possess is similarly unsupported by *Yoder v. Ingersol. Rand Co.*, because the information transmitted in *Yoder* was provided by the Plaintiff in that case—nothing in *Yoder* examines information that was forcefully transmitted to a third party by systems implemented by the defendant. 31 F.Supp.2d 565 (N.D. Ohio 1997).

BYU next asserts that if it did anything, it only "caused" the disclosure of PII to Meta and "causing" the disclosure of PII is not actionable under the VPPA. But (again) this argument has been dismissed by Defendant's own authorities. *See In re Hulu*, 2014 WL 1724344, at *15-16 (holding that a website's installation of technology that operates at the website's discretion and shares PII with a third party through cookies, as opposed to via a direct disclosure from the website itself, does not negate knowledge or show absence of evidence of about knowledge). In any event, courts from many jurisdictions consistently hold that a website's use of the Pixel constitutes a knowing disclosure of PII to Meta. *Czarnionka*, 2022 WL 17069810, at *3 (holding it is inaccurate for defendant to claim that the [Pixel transmission] occurs independent of any action by [defendant]); *Lebakken*, 640 F.Supp.3d 1335; *Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023); *Harris*, 662 F.Supp.3d at 1334.

Finally, BYU suggests that unless it knew on a transmission-by-transmission basis whether the identified individual was, in fact, a subscriber, it cannot have possessed "actual knowledge" that it was transmitting PII. At this stage, whether every individual whose PII was disclosed to

---

[14] *Eichenberger* examined whether a Roku serial number qualifies as PII when it must be cross-referenced with proprietary data collected by the advertising company at issue through a sophisticated "visitor stitching" technique, and *Nickelodeon* examined whether a technological process called "browser fingerprinting" sufficiently qualifies as PII, where it required the cross-referencing of many unique identifiers associated with a user's computer or mobile device.

Meta had a BYUtv "account" is irrelevant: what matters is whether BYU installed its Pixel (i) knowing its subscribers viewed video content on BYUtv (it does); (ii) knowing some of its subscribers possess Facebook accounts (it does); and (iii) knowing that its Pixel would share PII about its subscribers with Meta when they watched videos on BYUtv (it does). BYU also misstates *In re Hulu* which clearly states that "actual knowledge" exists if the defendant "knowingly disclosed: 1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material." 86 F.Supp.3d 1090, 1095 (N.D. Cal. 2015); *and Li*, 2023 WL 7280519, at *4 (finding allegations of knowing disclosures was sufficient at the motion to dismiss stage). Plaintiff need not plead that "on a visitor-to-visitor basis" [BYU] knew that a Website visitor's browser settings or status as a Facebook or BYUtv account holder would ensure his watching activities would be shared with Meta, Plaintiff only needs to plead that BYU's use of the Pixel would cause PII to be transmitted to Meta. *Golden*, 688 F.Supp.3d at 161.

BYU installed its pixel for the purpose of sharing its users' video-watching with Meta so that Meta could target advertising back to those same users. In light of Plaintiff's allegations detailing how and why BYU knows how the Pixel operates, it strains credulity to suggest BYU *was not aware* that its Pixel disclosed its subscribers' PII to Meta.

### *C. <u>BYU's Consent Argument Is Improper and Unavailing</u>*

There is no question that Plaintiff alleges he did not consent to BYU's sharing of his PII with Meta, and BYU's silence on its own Terms of Use and Privacy Policy ("Terms") is deafening. Nowhere does BYU even *attempt* to suggest its Terms notify its subscribers that it will share their PII with Meta (they don't), nor does BYU assert its Terms endeavor to seek their consent (they don't). MTD at 19-22. Instead, BYU argues Plaintiff's agreement with Meta somehow relieves

BYU of the duties imposed upon it by the VPPA. This omission all but admits that BYU's online policies are inadequate

The VPPA provides express requirements that a VTSP *must* satisfy if it discloses PII pursuant to consent of its users. Such disclosure must be "with the informed, written consent…of the consumer," and, to be effective, the consent must be (i) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; (ii) "at the election of the consumer," and either at the time of the disclosure or in advance of the disclosure but not more than two years prior to the disclosure; and (iii) if the VTSP "has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw…from ongoing disclosures, at the consumer's election[.]" 18 U.S.C. § 2710(b)(2). BYU offers the following in support of its argument that Plaintiff consented to the disclosure of his PII: (1) Plaintiff agreed Meta could collect information about him from websites that "might" employ its tools across the internet, including by collection of his c_user cookie, (2) because he agreed Meta could collect such information, he necessarily agreed BYU could send such information to Meta, and (3) BYU's privacy policy informs him he can reject cookies, and by doing so he can withdraw from future disclosures. In fact, this paltry and ineffective consent flow fails to comply with *every* requirement of the VPPA.

*i. BYU Failed to Obtain Informed Written Consent*

"A [VTSP] may disclose *personally identifiable information* concerning any consumer…to any person *with the informed, written consent*…of the consumer[.]" 18 U.S.C. § 2710(b)(2)(B) (emphasis added). First, the VPPA requires the VTSP—not a third party—to obtain the consumer's

consent (i.e., "may disclose…*with* the informed consent").[15] Secondly, the consent must be "informed." BYU relies on Meta's privacy policy to inform its users that it will disclose their PII to Meta, but Meta's terms consist of almost 30,000 words across its Terms of Use, Privacy Policy, and Cookies Policy, and *never* mention Meta will receive video-viewing information, much less that BYU will share video-viewing information with Meta.[16] Consent must be actual, and to be informed, such consent must be accompanied by express notification of the practices at issue, "generalized notice is not sufficient to establish consent." *In re Meta Pixel Healthcare Litig.*, 647 F.Supp.3d 778, 793 (N.D. Cal. 2022). Such an omissive policy cannot support a claim that consent was "informed" when no user receives notice of exactly what "information" is disclosed to Meta.[17]

Informed, written consent requires that "the consumer manifested unambiguous acceptance of the terms." *See Hancock v. American Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (applying state law contract principles to internet contracting). Based only on the *current* Facebook registration flow, Defendant concludes that Plaintiff's use of Facebook necessarily indicated he assented to the Facebook terms, without providing any *evidence* that he so agreed to such terms. Without such *evidence* (which would be inappropriate at this stage, *see Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)), the Court cannot evaluate whether Plaintiff manifested his

[15] Merriam-Webster, "with" defined as "in possession of: having" or "in the possession or care of," https://www.merriam-webster.com/dictionary/with (last accessed Feb. 12, 2025).

[16] Defendant cites *Abady v. Lipocine Inc.,* No. 2:19-CV-00906, 2023 WL 2933080, at *2 (D. Utah Apr. 13, 2023) for the proposition that the Court can rely on documents outside the Complaint, such as Meta's policies or BYUtv's Website, in determining the outcome of this motion. However, *Abady* is clear that "such documents may properly be considered only for what they contain, not to prove the truth of their contents."

[17] Facebook.com, Privacy Policy, https://www.facebook.com/privacy/policy/ (last accessed Feb. 12, 2025).

assent to Meta's terms. BYU's argument fails this fundamental prong of the VPPA's consent requirements.

*ii. Meta's Terms Are Not In A Form Separate And Distinct From Other Obligations*

Next, Meta's terms are not "in a form separate and distinct from any form setting forth other legal or financial obligations of the consumer[.]" BYU argues it satisfies the second consent requirement because Meta's policies are "separate and apart" from BYU's other policies. MTD at 22. BYU's interpretation of this requirement is nonsense: the consent for the VTSP to disclose PII to a third party itself must be separate and distinct *from any other obligations of the consumer*, not separate from other agreements between the consumer and the VTSP. *See Feldman*, 659 F.Supp.3d 1023 ("It is not obvious that the Star Tribune Privacy Policy addresses a consumer's consent to disclosure of his or her video-viewing history, and it appears to cover many legal obligations beyond consent to disclose personally identifiable information under the VPPA.").

Even were this the case (it is ***obviously*** not), Meta's terms are **massive**, *supra* § IV.C.i., and are rife with other obligations of the consumer. A quick review of the Privacy Policy alone reveals that it is a multi-faceted amalgamation of dozens or purported legal obligations embedded among some 19,000 words. Meta's Privacy Policy is not solely dedicated to informing consumers of BYU's intent to share consumers' PII with Meta. There is no question this comingling runs afoul of the VPPA's consent requirements, which

> require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the

purchase.

*Cappello v. Walmart Inc.*, No. 3:18-cv-6678, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019). As noted in *Cappello*, "[t]he fact that such consent may be obtained over the Internet does not negate the statute's 'distinct and separate' form requirement. *Id*. Nor is designing a VPPA compliant website a burden, as BYUtv could have chosen to include a separate confirmation for consumers to assent to disclosures involving video services. *Id*.

*iii. Neither BYU's Nor Meta's Terms Provide Plaintiff The Opportunity To Withdraw From Such Disclosures*

Lastly, BYU makes two arguments that its consent flow satisfies 18 U.S.C. § 2710(b)(2)(B)(iii) and provides Plaintiff and its users an opportunity to withdraw from disclosures. First, it argues Meta's terms permit Plaintiff to "manage[] and prevent information shared with Facebook via the Meta Pixel from third-party websites," relying on Facebook's Cookies Policy. **But the linked authority does not provide Facebook users the ability to so prevent such disclosures**. MTD at 22 n. 29. In fact, Meta provides no setting through which a Facebook user can prevent the sharing of his/her PII with Meta: the *only* thing Meta facilitates is that *after* it receives such information Meta will "disconnect" it from the user's Facebook profile.[18] But to be clear: disconnecting a profile from offline activity does not stop BYU from sharing PII with Meta.

BYU next argues that its own privacy policy informs users how they can "reset their browser to refuse cookies if they don't want the information shared." MTD at 22. This is problematic for two reasons: First, the policy does not say that. What it actually says is: "you can

[18] Facebook.com, Disconnect your past activity off Meta technologies, https://www.facebook.com/help/287199741901674?helpref=faq_content (last accessed Feb. 12, 2025).

reset your browser to refuse all cookies or to indicate when a cookie is being sent."[19] In fact, the BYUtv privacy policy does not inform a user whatsoever that its website and cookies will facilitate the sharing of a user's PII with any third party. In fact, the privacy policy only defines "personal information" to include name, email, and account password—not online interactions). But more importantly, this still does not comply with the requirements of the VPPA, including because Defendant's offer to disable cookies does nothing more than inform a user that such option exists, without actually facilitating the option whatsoever.

The requirement that a user be permitted to withdraw from future disclosures is the third sub-requirement of 18 U.S.C. 2710(b)(2)(B), which means the "informed written consent" itself must include the opportunity to withdraw from such disclosures, and yet BYU's proffered option to withdraw is not only separate from the policy it claims notifies users it will share their PII with meta—it's on an entirely different website! The requirement to provide a user with the ability to withdraw from future disclosures makes little sense if the entity managing the opt-out is different from the entity obtaining and managing the consent.

*iv. Additional Considerations*

In addition to the failures to comply with the statutory language itself, BYU's consent regime suffers from other deficiencies. Although its policies are wholly deficient, it does not mean BYU can just swap out Meta's policies for its own: Meta's terms expressly limit their application to Meta and its users. *Applied Predictive Technologies, Inc. v. MarketDial, Inc.*, 598 F.Supp.3d 1264, 1276 (D. Utah 2022) (declining to extend contractual rights to third parties not intended under the terms of the agreement). BYU provides no authority for the proposition that Meta's

[19] BYUtv, Privacy Policy, www.byutv.org/privacy, (last accessed Feb. 12, 2025).

policy somehow relieves of it its duty under the VPPA to refrain from disclosing its subscribers' PII to any person. Meta's BTTs expressly prohibit its partners, like Defendant, from sharing information with Meta absent a lawful basis to share such information.

Continuing, the VPPA contemplates an "opt-in" mechanism—something Meta's terms simply can't provide for BYU. *Pileggi v. Washington Newspaper Publ'g Co*., LLC, No. CV 23-345 (BAH), 2024 WL 324121, at *7 (D.D.C. Jan. 29, 2024) ("Defendant cites no authority for the novel proposal that the VPPA's explicit opt-in consent requirement be disregarded, and other courts considering a plaintiff's alleged implicit consent due to posted privacy policies in the context of a VPPA standing inquiry have properly analyzed the issue using the statutory requirements for consent under the VPPA.") This standard should not be rejected here.

And finally, notwithstanding the above arguments that Defendant's purported consent regime utterly fails to comply with the VPPA, the argument is premature. *Fernandez v. Clean House LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (holding that affirmative defenses cannot be considered on a motion to dismiss). Under the VPPA, consent is an affirmative defense. *Feldman*, 659 F.Supp.3d at 1023 (holding that consent is an affirmative defense that must be proved by the defendant) *and Fan v. NBA Properties Inc*., No. 23-CV-05069-SI, 2024 WL 1297643, at *3 (N.D. Cal. Mar. 26, 2024) (same). This regime is typical for statutes like the VPPA. *Robison v. 7PN, LLC*, 569 F.Supp.3d 1175, 1182 (D. Utah 2021) (holding consent is an affirmative defense under the TCPA).

An exception to this rule exists if Plaintiff had alleged sufficient facts for the Court to fully analyze the issue of consent, *see Fernandez*, 883 F.3d at 1299, but Plaintiff did not do so here (nor must he). *See Robison*, 569 F.Supp.3d at 1023. To prove consent would require the analysis of

several complex issues, including (i) evidence identifying whether Plaintiff agreed to Meta's and/or BYU's terms, whether such an agreement extends through the current day, whether Meta's or BYU's (or both) apply, among other issues, and such a burden lies with BYU. *See Fernandez*, 883 F.3d at 1299; *see also Calhoun v. Google*, 113 F.4th 1141, 1151 (9th Cir. 2024) (applying the "reasonable" user standard to interpretation of online policies that conflict with each other).

## V. CONCLUSION

BYU established BYUtv to produce and distribute video materials to its audience and to maximize its subscriber base. BYU outfitted such online streaming platform with hidden surveillance tech to share its subscribers' PII with advertisers, including PII that is personal religious information. For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Complaint should be DENIED.

*/s/Allen Carney*
Allen Carney (*pro hac vice*)
acarney@cbplaw.com
Samuel R Jackson (*pro hac vice*)
sjackson@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
1 Allied Drive, Suite 1400
Little Rock, AR 72202
Tel: 501-312-8500
Fax: 501-312-8505

Mark Reich (to apply for *pro hac vice*)
mreich@zlk.com
Gary Ishimoto (to apply for *pro hac vice*)
gishimoto@zlk.com
**LEVI & KORSINSKY LLP**
33 Whitehall Street, 17th Floor
New York, NY, 10004
Tel: 212-363-7500
Fax: 212-363-7171

**ANDERSON & KARRENBERG**

*/s/ Jacob D. Barney*
Jacob D. Barney
***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Court and further served upon all parties of interest.

*/s/ Savannah Holland*