James S. Jardine (1647)
jjardine@rqn.com
Michael K. Erickson (12503)
merickson@rqn.com
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 323-3351

Michael Bleicher (*pro hac vice* forthcoming)
michael.bleicher@zwillgen.com
Jeff Landis (*pro hac vice* forthcoming)
jeff@zwillgen.com
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 706-5251

David M. Andersen (16352)
david_andersen@byu.edu
Stephen M. Craig (12066)
stephen_craig@byu.edu
Scott L. Halvorsen (12001)
scott.halvorsen@byu.edu
BRIGHAM YOUNG UNIVERSITY
OFFICE OF GENERAL COUNSEL
A-360 ASB
Provo, Utah 8602
Telephone: (801) 422-4722

*Attorneys for Defendant*
*Brigham Young University*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH – CENTRAL DIVISION**

| | |
|---|---|
| BENJAMIN GARCIA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHAM YOUNG UNIVERSITY d/b/a BYU BROADCASTING,<br>Defendant. | **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Case No. 1:24-cv-00188-AMA<br><br>Judge: Ann Marie McIff Allen<br><br>Magistrate Judge: Daphne A. Oberg |

## INTRODUCTION

Plaintiff's Opposition ("Opp.") relies on a fundamental misapprehension of the law at the heart of his claim. Plaintiff imagines the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), to be an omnibus privacy protection statute that prohibits *any* entity with a website from permitting *any* disclosure about video viewing, regardless of its core business or actual knowledge. His interpretation defies Congress' intent to prohibit intentional, public revelations like those that "motivated [the VPPA's] passage," when the clerk of an actual video store handed to a reporter a list of videos Judge Bork rented. *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278, 284 (3d Cir. 2016).

Nothing in either the VPPA's text or cases interpreting it supports Plaintiff's attempt to apply it to a religious educational institution operating a website with videos that incidentally support its mission. The Opposition compares, incorrectly, this case to those in which the VPPA applied to an entity because providing videos was a central part of *how or why that entity existed*. But neither the Complaint nor the Opposition suggest that if BYU stopped offering BYUtv, it would change the fundamental "business" BYU performs or the value (financial or otherwise) BYU creates, which is providing religious-based education to its students. Put simply, BYU is a religious university, not a "video tape service provider" ("VTSP") that is "in the business" of renting, selling, or delivering video. 18 U.S.C. § 2710(a)(4).

Even if Plaintiff could allege that BYU is a VTSP subject to the VPPA—and he cannot—the VPPA requires that a VTSP must "knowingly disclose . . . personally identifiable information," 18 U.S.C. § 2710(b)(1), which the Complaint fails to plausibly allege. The Complaint shows that BYU does not know which viewers of its site are Facebook subscribers. The Complaint also fails to allege (because it cannot) that BYU ever knows or possesses users' Facebook IDs ("FIDs") such

that it could disclose them to anyone. Finally, nothing in the VPPA prohibits Meta from being the party to obtain the consent for tracking Plaintiff's viewing on byutv.org, provided that consent does not contain obligations from Plaintiff to BYU, which it does not. Plaintiff tries to circumvent these issues by reading in requirements the statute does not contain. Accordingly, the Complaint fails to state a claim on which relief can be granted and must be dismissed.

## ARGUMENT

### I. No Court has held that an entity like BYU is a VTSP.

While different types of media companies can be VTSPs, offering video must be a *core part* of an entity's strategy, goals, or purpose. Plaintiff asks the Court to ignore this framework and the phrase "in the business" in the definition of a VTSP. In the process, Plaintiff mischaracterizes BYU's Motion and responds to those mischaracterizations instead of BYU's actual arguments. There is no caselaw to support treating BYU as a VTSP solely because it operates a website that provides religious or family-based videos to support its religious mission.

#### A. Courts consistently hold that an entity's "primary business" informs whether it is a VTSP.

Although courts have found that businesses other than Blockbuster video and its modern-day equivalents can be VTSPs, the analysis is more nuanced than simply confirming that offering videos counts among an entity's activities. The Opposition claims BYU argues that the VPPA applies only to companies with the "single focus" of offering videos. Opp. at 6. This is incorrect as to BYU's Motion and oversimplifies the question. Courts consistently hold that a business is *not* a VTSP when offering videos is incidental to how or why the business exists. The Opposition claims these cases merely concern whether placing advertisements on a website makes an entity a VTSP. *See* Opp. at 8. Not so. As the *Sellers v. Bleacher Report, Inc.* court observed (in a decision Plaintiff cites), the cases BYU cites in its Motion show that "the VPPA does not apply to retail websites that provide audio visual media *that is incidental to their primary business*." 2023 WL

4850180, at *6 (N.D. Cal. July 28, 2023) (emphasis added) (collecting cases); *see* Opp. at 7 *and* Mot. at 9–10. The decisions' applicability is not limited to retail websites with video advertisements. Nor does it matter that such cases "primarily [concern] retail companies that use videos incidentally to sell their retail goods—not companies for whom the videos are the product." 2023 WL 4850180, at *6; *see* Opp. at 5-6. That is the case here: BYU's "product" is not video; it is religious-based education. The videos BYU provides on BYUtv are incidental to that offering.

The other cases the Opposition points to only confirm the importance of the nexus between an entity's business purposes and its offering of videos, which is lacking here. In *Ambrose v. Boston Globe Media Partners*, the court found that "a self-described multimedia organization" was a VTSP. No. CV 21-10810-RGS, 2022 WL 4329373, at *1 (D. Mass. Sept. 19, 2022) (citations omitted). Similarly, *Belozerov v. Gannet Co.* found that the "media company" that owns *USA Today* and operated *USA Today*'s website was a VTSP. 646 F.Supp.3d 310, 311 (D. Mass. 2022). *Salazar v. Nat'l Basketball Ass'n* applied the VPPA to the NBA, which is in the business of broadcasting and monetizing its basketball games via videos on nba.com. 118 F.4th 533, 537 (2d Cir. 2024). Finally, the *Mata v. Zillow Group* court concluded that defendant's offering of video content was "significantly tailored to its business purpose of facilitating real estate transactions" because offering this video made it "*a superior platform for sellers to advertise their properties*." No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *3 (S.D. Cal. Dec. 18, 2024) (citations omitted) (emphasis added). BYU is not analogous to these businesses.

### B. Plaintiff has not plausibly alleged that offering video is a significant part of BYU's core purpose.

The Complaint fails to plausibly allege that offering videos is more than an incidental part of BYU's mission, business, or strategy. The Complaint does not allege, for example, that "rental, sale, or delivery" of video is part of BYU's core "business" of offering religious-based education

like in *Gannett* or *Boston Globe*. Indeed, such an allegation would not make sense on its face given the extensive, undisputed, and publicly available information about BYU's mission. *See, e.g.*, Mot. at 4–5 (collecting examples). Nor does the Complaint allege that BYU offers videos to give it a competitive advantage over other schools. Instead, the Opposition relies on a conclusory and unsupported statement that the Complaint "squarely alleges" that BYU is a VTSP. Opp. at 8. But without pointing to any allegations showing BYU's offering of videos on BYUtv is anything other than incidental to BYU's core function, the Complaint has not pleaded "factual content to nudge his claim . . . across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) (citation omitted) (cleaned up).

To sidestep the Complaint's failures, the Opposition proffers two straw-man arguments. First, it suggests that the Court need not perform the legal analysis set forth under the caselaw because BYUtv "has TV in its name." Opp. at 9. But Plaintiff did not sue BYUtv; no such entity exists. Rather, Plaintiff sued BYU. Following Plaintiff's logic, any organization that appends terms like "video," "media," or "TV" to some ancillary service it provides would be a VTSP.[1] The law requires more; if an organization is not "**substantially involved in the conveyance of video content**," it is not a VTSP. *Carroll v. Gen. Mills, Inc.,* No. CV 23-1746 DSF (MRWX), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (emphasis in original) (citation omitted).

Second, although BYU's religious and educational purpose mean that it *is* a nonprofit, BYU is not arguing that a nonprofit cannot be a VTSP, as the Opposition claims. *See* Opp. at 9. Plaintiff's accusation that BYU is proffering a "he did it, too" defense misunderstands both BYU's

[1] To take but three examples, Harvard Medical School, the University of Illinois, and the University of California have online repositories of videos in support of their educational missions, which also have one of those words in their names. *See, e.g.*, Harvard Med. Sch., "Video Library" (Feb. 26, 2025), https://hms.harvard.edu/news-events/multimedia/video-library; Univ. Ill., "Media Space" (Feb. 26, 2025), https://mediaspace.illinois.edu; Univ. of Cal., "uctv," (Feb. 26, 2025) https://www.uctv.tv/.

argument and the VPPA's purpose. *Id*. BYU argues that merely offering videos to the public does not make an entity a VTSP when such videos are incidental to the entity's primary purpose; otherwise, the VPPA would apply to universities, churches, and government institutions that offer videos peripherally supporting their *actual* missions. *See* Mot. at 11-13. That is worlds apart from applying the VPPA to nonprofits whose primary focus involves media delivery, something that *In re Vizio* suggested would comport with the statute's text and purpose. *See In re Vizio Consumer Priv. Litig.*, 238 F.Supp.3d 1204, 1221 (C.D. Cal. 2017); Opp. at 7 (citing same). This difference is clear in the two cases that the Opposition cites (one of which was a motion for preliminary class approval, not a decision), which both treated nonprofit *media* entities as VTSPs. *See* Opp. at 9, *citing Harris v. Public Broad. Serv.*, 662 F.Supp.3d 1327 (N.D. Ga. 2023) and Mem. of Law in Support of Pl.'s Unopposed Mot. for Preliminary Approval of Class Action Settlement, *Moog v. The Christian Broad. Network*, No. 1:24-cv-00501-PTG-IDD (E.D. Va. Nov. 8, 2024). Neither case addresses a defendant in a completely different field, like BYU. *None* of the Opposition's arguments address the most egregious defect in the Complaint: no court has ever applied the VPPA to an institution like BYU. Because the Complaint pleads no facts that offering videos is more than incidental to how or why BYU exists and operates, it provides no basis to apply the VPPA.

## II. Plaintiff must plead that BYU had actual knowledge of the disclosures.

The Opposition also cannot overcome the Complaint's failure to allege that BYU knowingly disclosed subscribers' personally identifiable information ("PII"). Once again, the Opposition does not engage with BYU's arguments. Instead, the Opposition miscasts them and misrepresents BYU as "blaming" Meta or users. These are distractions.

For example, the Opposition does not dispute that as a matter of statutory construction, the wording of the VPPA's knowledge requirement requires a VTSP *know* it is disclosing a statutory subscriber's PII. *See* Mot. at 16. Instead, the Opposition seeks to recast BYU's argument as saying

BYU must know "on a visitor-to-visitor basis" that each website visitor's browser settings and status as a Facebook or BYUtv account holder "would ensure" his or her watching activities would be shared with Meta. Opp. at 16. The level of knowledge BYU argues—that BYU know whether someone who visits the website is a registered account holder (i.e., "subscriber") or Facebook user—is not "irrelevant" as the Opposition claims (without citing any supporting authority). Opp. at 15-16. The statute requires it. Without that underlying knowledge, BYU cannot "know" it is disclosing viewing information about anyone protected by the VPPA. *See* 18 U.S.C. § 2710(b)(1); *see Obduskey v. Wells Fargo*, 879 F.3d 1216, 1221 (10th Cir. 2018), *aff'd sub nom. Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019) (when statutory "language is clear," courts' analysis typically ends). This interpretation also comports with Congress' intent in enacting the VPPA. *See In re Nickelodeon*, 827 F.3d at 278.

The Opposition similarly offers no meaningful response to the fact that the VPPA's prohibition on "knowingly" disclosing PII requires *actual* knowledge. 18 U.S.C. § 2710(b)(1); *see In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) ("the term 'knowingly' connotes actual knowledge" in this context," i.e., "consciousness of transmitting the private information . . . not merely . . . transmitting the code."). The Opposition's attempt to dismiss *In re Hulu*'s interpretation of "knowingly" as "more strict" than other courts' is unavailing. Opp. at 13. The decisions the Opposition cites *do not* reject an actual knowledge requirement; they simply find that *those* complaints contained sufficient allegations. *See Li v. Georges Media Group LLC*, No. 23-cv-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (endorsing *In re Hulu* standard); *Lebakken v. WebMD, LLC*, 640 F.Supp.3d 1335, 1343 (N.D. Ga. 2022) (same); *see also Czarnionka v. Epoch Times Assoc'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, at *4 (S.D.N.Y.

Nov. 17, 2022) (applying actual knowledge standard). The Opposition points to no case holding that the VPPA requires only broad, generalized knowledge that something *could* be disclosed.

None of the Opposition's arguments for why the Complaint has plausibly alleged that BYU had actual knowledge it was disclosing information about a statutory subscriber withstand scrutiny. The Opposition first argues that Meta's Business Tools Terms "disclose that the Pixel personally identifies users" via their FID. Opp. at 10. Neither the Complaint nor the Opposition substantiate this claim with those Terms' supposedly "unambiguous" language. *Id*. Next, the Opposition argues that because BYU "agreed to [Meta's] terms when it obtained the base Pixel code," it must have known "*exactly* how the Pixel operates" and that the Complaint alleges actual knowledge by claiming BYU "receives the benefits" from using the Pixel. *Id*. at 11-12 (emphasis added).

The allegations the Opposition points to as supporting these arguments lack substance, relevance, or both. For example, some allegations simply *label* BYU's conduct "knowing" without alleging supporting facts. *See, e.g.*, Compl. ¶¶ 1, 5; *Iqbal*, 556 U.S. at 678 ("labels and conclusions" or "formulaic recitation" inadequate) (citation omitted). Others allege that the Pixel discloses a Facebook user's FID and the title of a video watched via its c_user cookie, or quote Meta's promotional materials; however, this is irrelevant to whether BYU ever possessed such FIDs so it could disclose them or ever knew that it was transmitting PII about a particular statutory subscriber. *See* Compl. ¶ 4-5, 38, 45-52, 63-65, 78; Mot. at 14-15. Finally, the Opposition mischaracterizes BYU's explanation that it never knows or possesses FIDs to "no Pixel, no PII." Opp. at 13. This reductive attempt at a "but for" analysis misses the point because the VPPA requires more—specifically that BYU have actual knowledge that it was disclosing PII of statutory subscribers.[2]

[2] For this reason, the diagram in the Motion (derived from the Complaint) is accurate, not "misleading." Opp. at 13-14. Plaintiff's incomplete reproduction of *part* of the diagram is what is misleading. Further, Plaintiff claims that *Yoder v. Ingersoll-Rand Co.* is inapposite. *See* Opp. at

*See Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017). At best, Plaintiff alleges that BYU knowingly engaged Facebook to provide services. That is not enough.

**III. Plaintiff had VPPA-compliant notice from Meta and provided consent.**

Finally, nothing in the Opposition changes that Plaintiff consented to any alleged data sharing through his agreement with Facebook. VPPA-compliant consent must be informed, conveyed via an agreement that is "distinct and separate" from any agreements Plaintiff entered into with BYU, given in advance for a period of not more than two years, and provide the ability to opt out of ongoing disclosures. *See* Mot. at 22; 18 U.S.C. § 2710(b)(2)(B). Plaintiff's agreements with Facebook combined with BYU's Privacy Policy satisfy these conditions, and the Opposition's arguments to the contrary are unsupported by the VPPA's text.

First, the Opposition argues that Plaintiff's consent via Facebook does not apply because the VTSP must obtain the consent. *See* Opp. at 17-18. The VPPA contains no such requirement, however, and Plaintiff cites no authority supporting this reading. In fact, the statute's text makes clear this is not the case. The relevant portion of the consent provision states that a VTSP may disclose PII "*with the informed, written consent* . . . of the consumer that" meets the enumerated requirements. 18 U.S.C. § 2710(b)(2)(B) (emphasis added). In contrast, another portion of the same section states that PII may only be disclosed if "*the video tape service provider* has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw" consent. 18 U.S.C. § 2710(b)(2)(B)(iii) (emphasis added). It is well-established that in a statute, "the same

---

15 (citing 31 F.Supp.2d 565 (N.D. Ohio 1997)). But *Yoder* concerned whether an entity could be liable for disclosing information about an AIDS diagnosis that it did not read. *See id.* at 568. *Yoder* indicates that even far more sensitive information than someone viewing family-friendly TV is subject to stricter standards than imputed knowledge. In contrast, Plaintiff offers only groundless speculation that the titles of BYU videos could reveal anything "intimate." Opp. at 5-6.

term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (citing *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) ("'money remuneration' must mean something different from 'all remuneration' when used in 'companion' statutes"). Congress clearly stated that the *VTSP* must provide the opportunity to opt-out, but included no such restriction on who may obtain consent.

The Opposition next argues that Plaintiff's consent is invalid because Meta's disclosures are too lengthy and do not specifically note that *BYU* may "share video-viewing information with Meta." Opp. at 18.[3] But Utah law requires each party to "read and understand the terms of a contract" they enter, and a party "may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense." *John Call Eng'g, Inc. v. Manti City Corp.,* 743 P.2d 1205, 1208 (Utah 1987). Plaintiff also does not dispute that Meta explained that it would collect Plaintiff's PII when he browsed *any* site not operated by Meta—including any data generated by visiting BYUtv.

The Opposition also wrongly argues that Plaintiff's consent is not valid because Facebook's disclosures contain other obligations *to Meta*. *See* Opp. at 19. But the Opposition does not identify any authority that prohibits written consent from including obligations to entities other than the VTSP. Instead, it cites a case that merely confirms the notice and consent cannot contain other obligations to the VTSP. *See Feldman v. Star Trib. Media Co.*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) (observing that defendant's privacy policy "appears to cover many legal obligations beyond consent

---

[3] Plaintiff argues that these Terms may only be judicially noticed for "what they contain, not to prove the truth of their contents." Opp. at 18, fn. 16 (citations omitted). But BYU has requested notice precisely—and only—to show that these disclosures were made to Plaintiff. Plaintiff also argues that there is no evidence he consented to Facebook's Terms. *See id*. at 23. But Plaintiff pleaded that he is a Facebook user, and in signing up for Facebook, users must accept its Terms of Service. *See In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016). Arguing the issue is proper here. *See* Opp. at 22; *Storey v. Seipel*, No. 2:22-CV-00486, 2024 WL 4436609, at *4 (D. Utah Oct. 24, 2024) ("A court may dismiss a claim under 12(b)(6) when the face of the complaint shows a claim is barred by an affirmative defense.").

to disclose personally identifiable information under the VPPA"). Similarly, the other authority the Opposition cites, *Cappello v. Walmart Inc.*, merely holds that a consent obtained over the Internet still needs to be "distinct and separate" to satisfy the VPPA – which is true of Meta's Terms. No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019). Congress could have written the VPPA to say that the "form" may not include "obligations of the consumer" to *any* entity, but it did not.

Finally, the Opposition argues that Facebook's Terms are not valid consent because Plaintiff could not withdraw his consent "on a case-by-case basis" or altogether. *See* Opp. at 20-21. However, Plaintiff could withdraw consent by logging out of Facebook at any time, or every time, before he visited byutv.org. *See* 18 U.S.C. § 2710(b)(2)(B)(iii). Plaintiff's claims to the contrary simply don't make sense (*see* Opp. at 20), given that the Pixel only operates when a user visits other sites *while logged into Facebook*, and only the user can decide when they will be logged into Facebook. *See* Compl. ¶ 48, fn. 17. By the same token, Plaintiff could "opt-in" by logging into Facebook before visiting byutv.org. Opp. at 22.[4]

## CONCLUSION

Plaintiff fails to allege that BYU is a VTSP, and his claims accordingly fail. But even if he could allege this, the Complaint reveals that BYU did not actually know what information Meta received because it could not read the c_user cookie. Finally, Plaintiff consented to the disclosures by accepting Meta's separate Terms and watching BYUtv videos while logged into Facebook. The Complaint thus fails to state a claim on which relief can be granted and must be dismissed.

---

[4] Confusingly, Plaintiff complains that BYU's Privacy Policy does not provide a more fulsome opt-in or opt-out mechanism. *See* Opp. at 21. But Plaintiff's agreement to the Meta Terms (not BYU's Privacy Policy) provided the "consent" that was separate and distinct from any obligations to BYU. 18 U.S.C. § 2710(b)(2)(B)(i). BYU's Privacy Policy simply fulfills the separate VPPA requirement of providing information about how to opt out from ongoing disclosures. *Id.* § 2710(b)(2)(B)(iii).

Dated: February 28, 2025

Respectfully submitted,

**RAY QUINNEY & NEBEKER P.C.**

By: *_/s/ Michael K. Erickson_*
James S. Jardine
jjardine@rqn.com
Michael K. Erickson
merickson@rqn.com

**ZWILLGEN PLLC**

Michael Bleicher (*pro hac vice* forthcoming)
michael.bleicher@zwillgen.com
Jeff Landis (*pro hac vice* forthcoming)
jeff@zwillgen.com

**BRIGHAM YOUNG UNIVERSITY**

David M. Andersen
david_andersen@byu.edu
Stephen M. Craig
stephen_craig@byu.edu
Scott L. Halvorsen
scott.halvorsen@byu.edu

*Attorneys for Defendant*
*Brigham Young University*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2025, I electronically filed the foregoing **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF filing system which sent notification to the following:

Jacob D. Barney
**ANDERSON & KARRENBERG, P.C.**
50 W. Broadway, Ste. 600
Salt Lake City, UT 84101
jbarney@aklawfirm.com

James Allen Carney
Joseph Henry (Hank) Bates, III
Samuel Randolph Jackson
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Ste. 1400
Little Rock, Arkansas 72202
acarney@cbplaw.com
hbates@cbplaw.com
sjackson@cbplaw.com

*/s/ Megan Kuchenthal*